ELECTRONICALLY FILED
8/10/2012 2:58 PM
CV-2012-901035.00
CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
FLORENCE CAUTHEN, CLERK

## IN THE CIRCUIT COURT OF
## MONTGOMERY COUNTY, ALABAMA

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR COLONIAL
BANK, a domestic banking
corporation,

        Plaintiff,

    v.

BANC OF AMERICA FUNDING CORPORATION,
a corporation; BANK OF AMERICA
CORPORATION, a corporation; MERRILL
LYNCH, PIERCE, FENNER & SMITH INC.,
a corporation; BANC OF AMERICA
MORTGAGE SECURITIES, INC., a
corporation; CITICORP MORTGAGE
SECURITIES, INC., a corporation;
CITIMORTGAGE, INC., a corporation;
CITIGROUP MORTGAGE LOAN TRUST INC.,
a corporation; CITIGROUP FINANCIAL
PRODUCTS INC., a corporation;
CITIGROUP GLOBAL MARKETS INC., a
corporation; CREDIT SUISSE FIRST
BOSTON MORTGAGE SECURITIES CORP., a
corporation; CREDIT SUISSE
MANAGEMENT LLC, a limited liability
company; CREDIT SUISSE SECURITIES
(USA) LLC, a limited liability
company; FIRST HORIZON ASSET
SECURITIES INC., a corporation;
FIRST HORIZON HOME LOAN CORPORATION,
a corporation; FTN FINANCIAL
SECURITIES CORP., a corporation; and
HSBC SECURITIES (USA) INC., a
corporation;

        Defendants.

Civil Action No.
_____

**JURY TRIAL DEMANDED**

## COMPLAINT

Comes now Plaintiff Federal Deposit Insurance Corporation as Receiver for Colonial Bank for its Complaint against Banc of America Funding Corporation (**BAFC**); Bank of America Corporation (**BAC**); Merrill Lynch, Pierce, Fenner & Smith Inc. (successor by merger to Banc of America Securities LLC, which is referred to in this Complaint as **BAS**); Banc of America Mortgage Securities, Inc. (**BOAMS**); Citicorp Mortgage Securities, Inc. (**CMSI**); CitiMortgage, Inc. (**CitiMortgage**); Citigroup Mortgage Loan Trust Inc. (**CMLTI**); Citigroup Financial Products Inc. (**Citigroup FP**); Citigroup Global Markets Inc. (**Citigroup**); Credit Suisse First Boston Mortgage Securities Corp. (**CSFB Mortgage Securities**); Credit Suisse Management LLC (**Credit Suisse Management**); Credit Suisse Securities (USA) LLC (formerly known as Credit Suisse First Boston LLC and referred to in this Complaint as **Credit Suisse**); First Horizon Asset Securities Inc. (**FHASI**); First Horizon Home Loan Corporation (**FHHLC**); FTN Financial Securities Corp. (**FTN**); and HSBC Securities (USA) Inc. (**HSBC**), and alleges as follows:

## I.  NATURE OF THIS ACTION

1.  This is an action for damages caused by violation of the Alabama Securities Act (**ASA**) and the Securities Act of 1933 (**1933 Act**) by the defendants. As alleged in detail below, defendants issued, underwrote, or sold 14 securities

known as "certificates," which were backed by collateral pools of residential mortgage loans in 12 securitizations. Colonial Bank (**Colonial**) paid approximately $311 million for all of the certificates. When they issued, underwrote, or sold the certificates, the defendants made numerous statements of material fact about the certificates and, in particular, about the credit quality of the mortgage loans that backed them. Many of those statements were untrue. Moreover, the defendants omitted to state many material facts that were necessary in order to make their statements not misleading. For example, the defendants made untrue statements or omitted important information about such material facts as the loan-to-value ratios of the mortgage loans, the extent to which appraisals of the properties that secured the loans were performed in compliance with professional appraisal standards, the number of borrowers who did not live in the houses that secured their loans (that is, the number of properties that were not primary residences), and the extent to which the entities that made the loans disregarded their own standards in doing so.

2. Based on an analysis of a random sample of the loans that backed the certificates that Colonial purchased, the defendants made such untrue or misleading statements or omissions about at least the following numbers of loans.

| Securitization No.[1] | Number of Loans about which Defendants Made Material Untrue or Misleading Statements[2] | Number of Loans that Backed the Certificates | Percentage of Loans about which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 650 | 1,176 | 55.3% |
| 2 | 251 | 1,002 | 25.0% |
| 3 | 592 | 1,202 | 49.0% |
| 4 | 443 | 721 | 61.4% |
| 5 | 375 | 607 | 61.8% |
| 6 | 452 | 709 | 63.8% |
| 7 | 642 | 1,304 | 49.2% |
| 8 (pool 2) | 1,004 | 1,539 | 65.2% |
| 8 (pool 3) | 241 | 356 | 67.7% |
| 9 | 735 | 1,151 | 63.9% |
| 10 (pool I) | 369 | 647 | 57.0% |
| 10 (pool II) | 869 | 1,505 | 57.7% |
| 11 | 500 | 862 | 58.0% |
| 12 | 938 | 1,557 | 60.2% |

---

[1]   Colonial purchased two certificates in Securitization No. 8 and two certificates in Securitization No. 10.

[2]   The method of random sampling that Plaintiff used ensures that conclusions about the entire collateral pool have a margin of error of no more than plus or minus 5% at a confidence level of 95% (that is, one can be 95% certain that the true percentage in the collateral pool as a whole is within 5% of the percentage measured in the sample). For example, one can be 95% certain that the number of loans in Securitization No. 1 about which defendants made untrue or misleading statements or omissions is within 5% of 650, that is, between 618 and 683. The same margin of error should be applied to all information in this Complaint and accompanying Schedules that is based on a random sample of loans in a collateral pool.

3. The certificates are "securities" within the meaning of the ASA and the 1933 Act. The defendants are liable under the following provisions of the ASA and the 1933 Act:

*As issuers:* The following defendants, which issued the certificates that Colonial purchased, are liable as "issuers" under Section 11 of the 1933 Act: CMSI, which issued three of the certificates; CSFB Mortgage Securities, which issued four of the certificates; FHASI, which issued four of the certificates; and BAFC, BOAMS, and CMLTI, each of which issued one of the certificates.

*As underwriters:* The following defendants, which underwrote the certificates that Colonial purchased, are liable as "underwriters" under Section 11 of the 1933 Act: BAS, which underwrote five of the certificates; Citigroup, which underwrote four of the certificates; Credit Suisse, which underwrote six of the certificates; FTN, which underwrote four of the certificates; and HSBC, which underwrote two of the certificates.

*As sellers:* The following defendants, which sold the certificates to Colonial when they were initially offered to the public, are liable as "sellers" under Section 8-6-19(a)(2) of the ASA and Section 12(a)(2) of the 1933 Act: BAS, which sold two of the certificates; Citigroup, which sold four of the certificates; Credit Suisse, which sold six of the certificates; and HSBC, which sold two of the certificates.

The following defendants are also liable as sellers under Section 8-6-19(a)(2) of the ASA and Section 12(a)(2) of the 1933 Act because they issued the certificates that Colonial purchased when they were initially offered to the public: CMSI, which issued three of the certificates; CSFB Mortgage Securities, which issued four of the certificates; FHASI, which issued four of the certificates; and BAFC, BOAMS, and CMLTI, each of which issued one of the certificates.

*As control persons:* BAC, Citigroup FP, CitiMortgage, Credit Suisse Management, and FHHLC are liable as "controlling persons" of BAFC, CMLTI, CMSI, CSFB Mortgage Securities, and FHASI, respectively, under Section 8-6-19(c) of the ASA and Section 15 of the 1933 Act, 15 U.S.C. §77o.

## II.  PARTIES

4.  The Federal Deposit Insurance Corporation (**FDIC**) is a corporation organized and existing under the laws of the United States of America. Under the Federal Deposit Insurance Act, the FDIC is authorized to be appointed as receiver for failed insured depository institutions. On August 14, 2009, the FDIC was duly appointed the receiver for Colonial. Under the Federal Deposit Insurance Act, the FDIC as receiver succeeds to, and is empowered to sue and complain in any court of law to pursue, all claims held by banks for which it is the receiver. 12 U.S.C. §§ 1819, 1821(d)(2)(A)(i). Thus, the FDIC as Receiver for Colonial

has authority to pursue claims held by Colonial, including the claims made against the defendants in this action.

5.   Defendant BAFC is a corporation organized under the laws of Delaware.

6.   Defendant BAC is a corporation organized under the laws of Delaware. During the relevant time, BAC controlled BAFC. Under Section 8-6-19(c) of the ASA and Section 15 of the 1933 Act, BAC therefore is liable jointly and severally with, and to the same extent as, BAFC.

7.   Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is a corporation organized under the laws of Delaware. It is the successor by merger to BAS. Merrill Lynch, Pierce, Fenner & Smith Inc. succeeded to all of the liabilities of BAS.

8.   Defendant BOAMS is a corporation organized under the laws of Delaware.

9.   Defendant CMSI is a corporation organized under the laws of Delaware.

10.   Defendant CitiMortgage is a corporation organized under the laws of New York. During the relevant time, CitiMortgage controlled CMSI. Under Section 8-6-19(c) of the ASA and Section 15 of the 1933 Act, CitiMortgage therefore is liable jointly and severally with, and to the same extent as, CMSI.

11.   Defendant CMLTI is a corporation organized under the laws of Delaware.

12.   Defendant Citigroup FP is a corporation organized under the laws of Delaware. During the relevant time, Citigroup FP controlled CMLTI. Under Section 8-6-19(c) of the ASA and Section 15 of the 1933 Act, Citigroup FP therefore is liable jointly and severally with, and to the same extent as, CMLTI.

13.   Defendant Citigroup is a corporation organized under the laws of New York.

14.   Defendant CSFB Mortgage Securities is a corporation organized under the laws of Delaware.

15.   Defendant Credit Suisse Management is a limited liability company organized under the laws of Delaware. During the relevant time, Credit Suisse Management controlled CSFB Mortgage Securities. Under Section 8-6-19(c) of the ASA and Section 15 of the 1933 Act, Credit Suisse Management therefore is liable jointly and severally with, and to the same extent as, CSFB Mortgage Securities.

16.   Defendant Credit Suisse is a limited liability company organized under the laws of Delaware.

17.   Defendant FHASI is a corporation organized under the laws of Delaware.

18.   Defendant FHHLC is a corporation organized under the laws of Kansas. During the relevant time, FHHLC controlled FHASI. Under Section 8-6-19(c) of the ASA and Section 15 of the 1933 Act, FHHLC therefore is liable jointly and severally with, and to the same extent as, FHASI.

19. Defendant FTN is a corporation organized under the laws of Tennessee.

20. Defendant HSBC is a corporation organized under the laws of Delaware.

### III.   JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction pursuant to Alabama Code § 8-6-19.

22. The amount in controversy exceeds the jurisdictional minimum of this Court.

23. This Court has personal jurisdiction over the defendants pursuant to Alabama Rule of Civil Procedure 4.2.

24. Venue is proper in this Court pursuant to Alabama Code § 6-3-7.

### IV.   SECURITIZATION OF MORTGAGE LOANS

25. The securities that Colonial purchased are so-called **residential mortgage-backed securities,** or **RMBS,** created in a process known as **securitization.** Securitization begins with loans on which the borrowers are to make payments, usually monthly. The entity that makes the loans is known as the **originator** of the loans. The process by which the originator decides whether to make particular loans is known as the **underwriting** of loans. The purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit standing to repay them and only against sufficient collateral. In the loan underwriting process, the originator applies its **underwriting standards.**

26.  In general, residential mortgage lenders may hold some of the mortgage loans they originate in their own portfolios and may sell other mortgage loans they originate into securitizations.

27.  In a securitization, a large number of loans, usually of a similar type, are grouped into a **collateral pool**. The originator of those loans sells them (and, with them, the right to receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The trust raises the cash to pay for the loans by selling **securities**, usually called **certificates**, to investors such as Colonial. Each certificate entitles its holder to an agreed part of the cash flow from the loans in the collateral pool.

28.  In a simple securitization, the holder of each certificate is entitled to a *pro rata* part of the overall monthly cash flow from the loans in the collateral pool.

29.  In a more complex securitization, the cash flow is divided into different parts, usually called **tranches** ("tranche" is "slice" in French), and the certificates are divided into different **classes**, each with different rights. Each class of certificates is entitled to the cash flow in the tranche corresponding to that class.

30.  One way in which the cash flow is divided — and the rights of different classes of certificates distinguished — is by priority of payment or, put differently, risk of nonpayment. The most **senior** class of

certificates usually is entitled to be paid in full before the next most senior class, and so on. Conversely, losses from defaults in payment of the loans in the collateral pool are allocated first to the most **subordinate** class of certificates, then to the class above that, and so on. The interest rate on each class of certificates is usually proportional to the amount of risk that that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred to as the **waterfall.**

31. The risk of a particular class of certificate is a function of both the riskiness of the loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying loans are quite risky, the certificates may bear so little of that risk that they may be rated as **triple-A.** (According to Moody's, "[o]bligations rated Aaa are judged to be of the highest quality, with minimal credit risk.") For example, assume a securitization of $100 million of risky loans, on which the historical loss rate is 5%. Assume that there are two classes of certificates, a senior class of $50 million and a subordinate class of $50 million. Even though the underlying loans are quite risky, the senior class of certificates would be paid in full as long as the $100 million of loans produced payments of at least $50 million plus interest, that is, unless the loss rate on those loans

exceeded 50%, fully ten times the historical average. All of the certificates referred to in this Complaint were rated triple-A when Colonial purchased them.

32. Each securitization has a **sponsor**, the prime mover of the securitization. Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization. Other times, the sponsor may be an investment bank, which purchases loans from one or more originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The sponsor arranges for title to the loans to be transferred to an entity known as the **depositor**, which then transfers title to the loans to the trust.

33. The obligor of the certificates in a securitization is the trust that purchases the loans in the collateral pool. Because a trust has few assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law therefore treats the depositor as the **issuer** of a residential mortgage-backed certificate.

34. **Securities underwriters**, like BAS, Citigroup, Credit Suisse, FTN, and HSBC, play a critical role in the process of securitization. They underwrite the sale of the certificates, that is, they purchase the certificates from the trust and then sell them to investors. Equally

important, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

35. Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall). The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called "loan files." For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file may also include notes from the person who underwrote the loan about whether and how the loan complied with the originator's underwriting standards, including documentation of any "compensating factors" that justified any departure from those standards.

36. Potential investors in certificates are not given access to loan files. Instead, the securities underwriters are responsible for gathering, verifying, and presenting to potential investors the information about the credit quality of the loans that will be deposited into the trust.

They do so by using information about the loans that has been compiled into a database known as a **loan tape.** The securities underwriters use the loan tape to compile numerous statistics about the loans, which are presented to potential investors in a **prospectus supplement,** a disclosure document that the underwriters are required to file with the Securities and Exchange Commission. (Colonial did not have access to the loan tapes before it purchased the certificates, but Plaintiff has reviewed data from the loan tapes in preparing this Complaint.)

37. As alleged in detail below, the information in the prospectus supplements and other offering documents about the credit quality of the loans in the collateral pools of the trusts contained many statements that were material to the credit quality of those loans, but were untrue or misleading.

## V.   DEFENDANTS' MATERIAL UNTRUE OR MISLEADING STATEMENTS ABOUT THE CERTIFICATES

38. Colonial purchased certificates in 12 securitizations (referred to in this Complaint as Securitizations Nos. 1 through 12). Details of each securitization and each certificate are stated in Item 38 of Schedules 1 through 12 of this Complaint, which correspond to Securitizations Nos. 1 through 12. Plaintiff incorporates into this paragraph 38, and alleges as though fully set forth in this paragraph, the contents of Item 38 of the Schedules.

39.   The  prospectus  supplement  for  each  of  the  12 securitizations  is  available  from  the  Securities  and Exchange  Commission's  website.  A  URL  for  each  prospectus supplement  is  included  in  Item  38  of  the  Schedules.  The prospectus  supplements  are  incorporated  into  this  Complaint by reference.

40.  In  general,  Plaintiff  drew  and  analyzed  a  random sample  of  400  loans  from  the  collateral  pool  of  each securitization in which Colonial purchased a certificate.[3]

41.  Many  of  the  statements  of  material  fact  that  the defendants  made  in  the  prospectus  supplements  were  untrue or  misleading.  These  untrue  or  misleading  statements included the following.

**A.   Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the Mortgage Loans, and the Appraisals  of  the  Properties,  in  the  Collateral Pools**

**1.   LTVs**

**(a)  The materiality of LTVs**

42.  The  loan-to-value  ratio  of  a  mortgage  loan,  or LTV,  is  the  ratio  of  the  amount  of  the  mortgage  loan  to  the lower  of  the  appraised  value  or  the  sale  price  of  the mortgaged  property  when  the  loan  is  made.  For  example,  a

---

[3] The  group  of  loans  that  backed  the  certificates  that Colonial  purchased  in  Securitization  No.  8  only  had  356 loans.  For  that  group,  Plaintiff  analyzed  the  289  loans  on which data were available.

loan of $300,000 secured by a property valued at $500,000 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are therefore one of the most crucial measures of the risk of certificates sold in that securitization. LTV is a primary determinant of the likelihood of default. The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less likely it is that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property, a so-called strategic default. LTV also is a primary determinant of the severity of losses on a loan that defaults. The lower the LTV, the lower the severity of losses if the loan defaults. Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

43. Beyond these fundamental effects on the likelihood and severity of default, LTVs also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage loans before maturity and when they do so) and therefore the expected lives of the loans. Prepayment patterns therefore affect many aspects of certificates that are material to the investors that purchase them, including

the life of the certificate and the timing and amount of cash that the investor will receive during that life.

44. In addition, rating agencies use LTVs to determine the proper structuring and credit enhancement necessary for securities, such as the certificates that Colonial purchased, to receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect.

45. An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, an inflated denominator will understate, sometimes greatly, the risk of a loan. To return to the example above, if the property whose actual value is $500,000 is valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to 54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based on the incorrect appraised value understates the risk of the loan.

46. For these reasons, a reasonable investor considers LTV critical to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a significant effect on both the risk and the rating of each certificate sold in that securitization and, thus,

are essential to the decision of a reasonable investor whether to purchase any such certificate.

**(b) Untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations**

47. In the prospectus supplements, the defendants made material untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations. Each such statement is identified in Item 47 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 47, and alleges as though fully set forth in this paragraph, the contents of Item 47 of the Schedules.

48. The defendants made these statements as statements of fact. Plaintiff is informed and believes, and based thereon alleges, that the defendants intended that these statements be understood as statements of fact. Colonial did understand the statements about the LTVs as statements of fact. Colonial had no access to appraisal reports or other documents or information from which it could verify the LTVs of the mortgage loans other than the statements that the defendants made about those LTVs.

**(c) An automated valuation model demonstrates that the defendants' statements about the LTVs were untrue because they were based on overstated valuations of the properties in the collateral pools.**

49. The stated LTVs of many of the mortgage loans in the securitizations were significantly lower than the true

18

LTVs because the denominators (that is, the value of the properties that secured those loans) that were used to determine the disclosed LTVs were overstated to a material extent. The weighted-average LTVs presented in the prospectus supplements were, therefore, untrue and misleading.

50. Using a comprehensive, industry-standard automated valuation model (**AVM**), it is possible to determine the true market value of a certain property as of a specified date. An AVM is based on objective criteria like the condition of the property and the actual sale prices of comparable properties in the same locale shortly before the specified date, and is more consistent, independent, and objective than other methods of appraisal. AVMs have been in widespread use for many years. The AVM on which these allegations are based incorporates a database of 500 million sales covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States. Independent testing services have determined that this AVM is the most accurate of all such models.

51. For many of the properties that secured the mortgage loans, the model determined that the LTVs presented in the prospectus supplements were understated. In particular, for many of the properties, the model determined that the denominator (that is, the appraised value of the property as stated in the loan tape and

compiled into the tables in the prospectus supplement) that was used in the disclosed LTV was 105% or more of the true market value as determined by the model as of the date on which each individual mortgage loan closed. (The model considered no transactions that occurred after that date.) In contrast, the model determined that the denominator that was used in the disclosed LTV was 95% or less of the true market value on a much smaller number of properties. Thus, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated.

52. For example, in Securitization No. 1, there were 1,176 mortgage loans that backed the certificate that Colonial purchased. On 270 of the properties that secured those loans, the model determined that the denominator that was used in the disclosed LTV was 105% or more of the true market value and the amount by which the stated values of those properties exceeded their true market values in the aggregate was $10,317,069. The model determined that the denominator that was used in the disclosed LTV was 95% or less of true market value on only 118 properties, and the amount by which the true market values of those properties exceeded the values reported in the denominators was $7,356,582. Thus, the number of properties on which the value was overstated exceeded by more than twice the number on which the value was understated, and the aggregate

amount overstated was nearly one-and-a-half times the aggregate amount understated.

53. On one of the loans in Securitization No. 1, the amount of the loan was $288,000, and the stated value of the property was $360,000, resulting in a stated LTV of 80%. The model, however, determined that the true value of the property was $266,000, resulting in a true LTV of 108% Thus, the stated value was higher than the true value by 35% and the stated LTV was lower than the true LTV by 28%. Both of these were huge discrepancies that were material to the credit quality of the loan.

54. The overstated values of 270 properties made virtually every statement by the defendants about the LTVs of the mortgage loans untrue or misleading. For example, the defendants stated that all but three mortgage loans had an LTV of 100% or less. In fact, 50 of the mortgage loans had LTVs of over 100%. Defendants also stated that the weighted-average LTV of the loans in the collateral pool was 72.68%. In fact, the weighted-average LTV of the loans was 81.1%. These differences were material for the reasons stated above.

55. The results of the valuations by the automated model in this example are summarized in the following table.

| | |
|---|---:|
| Number of loans that backed the certificate | 1,176 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 270 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $10,317,069 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 118 |
| Aggregate amount by which the true market values of those properties exceeded their stated values | $7,356,582 |
| Number of loans with LTVs over 100%, as stated by defendants | 3 |
| Number of loans with LTVs over 100%, as determined by the model | 50 |
| Weighted-average LTV, as stated by defendants | 72.68% |
| Weighted-average LTV, as determined by the model | 81.1% |

56. The model produced similar results for the mortgage loans in the collateral pools of each securitization. Details of the results of the model for each securitization are stated in Item 56 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 56, and alleges as though fully set forth in this paragraph, the contents of Item 56 of the Schedules.

> **(d) These statements also were misleading because the defendants omitted to state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.**

57. As mentioned above, the LTV of a mortgage loan is a key determinant of the likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the

less likely that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property. Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to predicting defaults and prepayments by borrowers. Also, as mentioned above, LTV affects the severity of loss on those loans that do default. The power of LTV to predict defaults, prepayments, and severities is a major reason why reasonable investors consider the LTVs of mortgage loans important to the decision whether to purchase a certificate in the securitization of those loans.

58. The predictive power of the LTV of a mortgage loan is much reduced if there are additional liens on the same property. Additional liens reduce the owner's equity in the property and thereby increase the owner's incentive to stop making mortgage payments and abandon the property if the value of the property falls below the combined amount of all of the liens on the property (a strategic default). Additional liens also exacerbate delinquencies and defaults because they complicate the servicing of mortgage loans and the management of delinquencies and defaults. Servicers of the first-lien mortgage must then deal not only with the borrower, but also with the servicer of the second-lien mortgage. For example, the servicer of a single mortgage may want to grant a borrower forbearance while the borrower is unemployed and allow him or her to add missed payments

to the principal of the loan and to resume payments when he or she is employed again. But the servicer of the second-lien mortgage may refuse such forbearance and initiate foreclosure and thereby force the borrower into default on the first mortgage as well.

59. According to land records, many of the properties that secured mortgage loans in the collateral pools of the securitizations were subject to liens in addition to the lien of the mortgage in the pool at the time of the closing of these securitizations.[4] The defendants failed to disclose in the prospectus supplements any of these additional liens. These additional liens increased the risk that those owners would default in payment of the mortgage loans.

60. To take an example, of the 1,176 properties that secured the mortgage loans that backed the certificate that Colonial purchased in Securitization No. 1, at least 456 were subject to liens in addition to the lien represented by the mortgage in the collateral pool. The defendants did not disclose in the prospectus supplement that those liens existed. Defendants stated that the weighted-average LTV of the properties was 72.68%, when, solely because of the additional liens on these 456 properties, the weighted-

---

[4]      In order to ensure that this calculation did not include liens that were paid off but were not promptly removed from land records, the additional liens referred to in this Complaint and the Schedules do not include liens that were originated on or before the date on which each mortgage loan in the pools was closed.

average combined LTV was 78.9%.[5] This is a significant difference.

61. On one of the loans, the original balance of the mortgage loan was $168,000, the represented value of the property was $210,000, and the reported LTV was 80%. On the date of the closing of this securitization, however, there were undisclosed additional liens on this property of $42,000. Thus, when all liens on the property were taken into account, the combined LTV of the loan was 100%, which was 20% higher than the stated LTV on that loan. This was a huge discrepancy that was material to the credit quality of the loan. In many cases, the amount of the undisclosed additional liens was much greater than the owner's ostensible equity, putting the owner "under water" on the day on which this securitization closed.

62. Details of the undisclosed additional liens in the securitizations are stated in Item 62 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 62, and alleges as though fully set forth in this paragraph, the contents of Item 62 of the Schedules. Plaintiff is informed and believes, and based thereon alleges, that discovery will demonstrate that the number of loans with additional liens is substantially higher than those disclosed in the Schedules.

---

[5]    The combined LTV is the ratio of all loans on a property to the value of the property.

63. Because the defendants did not disclose the existence or the amounts of these additional liens, all of the statements that they made about the LTVs of the mortgage loans were misleading.

## 2. Appraisals

64. As discussed above in paragraph 45, an accurate denominator (value of the mortgaged property) is essential to calculating an accurate LTV. An accurate appraisal of the property, in turn, is essential to identifying an accurate denominator.

65. In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. This upward bias in appraisals caused the denominators that were used to calculate the LTVs of many mortgage loans to be overstated and, in turn, the LTVs to be understated. The defendants' statements regarding the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a material number of the properties that secured those loans were biased upwards. In addition, the defendants stated that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice (**USPAP**), the professional standards that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those

statements were false because upwardly biased appraisals do not conform to USPAP.

      **(a)    The statements that the defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

66. The defendants omitted to state that the appraisals in these securitizations used inaccurate property descriptions, ignored recent sales of the subject and comparable properties, and used sales of properties that were not comparable, all in order to inflate the values of the appraised properties. The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 50 through 56, in each trust, the number of properties for which the value was overstated exceeded by far the number for which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table:

| Securitization No. | Ratio of Number of Properties Whose Value Was Overstated to Number Whose Value Was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 2.3 | 1.4 |
| 2 | 1.3 | 0.6 |
| 3 | 4.8 | 6.0 |
| 4 | 3.7 | 6.5 |
| 5 | 4.7 | 8.7 |
| 6 | 5.4 | 9.0 |
| 7 | 2.5 | 2.2 |
| 8 (pool 2) | 4.0 | 3.2 |
| 8 (pool 3) | 8.8 | 11.5 |
| 9 | 1.7 | 1.8 |
| 10 (pool I) | 3.4 | 4.1 |
| 10 (pool II) | 2.9 | 3.2 |
| 11 | 3.8 | 2.9 |
| 12 | 5.4 | 7.3 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

67. Plaintiff is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraisers' actual findings of the values of the properties based on their objective valuations.

**(b) The statements by the defendants about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

68. Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote

and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

69. USPAP includes the following provisions:

(a) USPAP Standards Rule 2-1(b)(iii) requires that "Each written or oral real property appraisal report must clearly and accurately set forth the appraisal in a manner that will not be misleading."

(b) USPAP Standards Rule 1-4(a) provides that "When a sales comparison approach is necessary for credible assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion."

(c) USPAP Standards Rule 1-4(b) provides that "When a cost approach is necessary for credible assignment results, an appraiser must:

> (i)   develop an opinion of site value by an appropriate appraisal method or technique;
>
> (ii)  analyze such comparable cost data as are available to estimate the cost new of the improvements (if any); and
>
> (iii) analyze such comparable data as are available to estimate the difference between the cost new and the present worth of the improvements (accrued depreciation)."

70.  The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 1 discussing "Sales History" states that "The requirement for the appraiser to analyze and report sales history and related information is fundamental to the appraisal process. Just as the appraiser must analyze pending and recent sales of comparable properties, the appraiser must take into account all pending and recent sales of the subject property itself."

71.  In the prospectus supplements, the defendants made statements that the appraisals of properties that secured the mortgage loans in the collateral pools were made in compliance with USPAP or with the appraisal standards of Fannie Mae and Freddie Mac, which required compliance with USPAP. Details of each such statement are stated in Item 71 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 71, and alleges as though fully set forth in this paragraph, the contents of Item 71 of the Schedules.

72.  Plaintiff is informed and believes, and based thereon alleges, that a material number of mortgage loans in the collateral pools had appraisals conducted that deviated from USPAP.

73. Each of the statements referred to in paragraph 71 was untrue because the appraisals of a material number of the properties referred to in each such statement did not conform to USPAP.

74. By each of the untrue and misleading statements referred to in paragraphs 47 and 71 above, the defendants materially understated the risk of the certificates that they issued, underwrote, or sold.

**B. Untrue or Misleading Statements About the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools**

**1. The materiality of occupancy status**

75. Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also influences prepayment patterns.

76. Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a securitization that are not secured by mortgages on primary residences is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans not secured

by primary residences, the greater the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans.

> **2. Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations**

77. In the prospectus supplements, the defendants made statements about the number of properties in the collateral pools of the securitizations that were the primary residences of their owners. To return to the example of Securitization No. 1, the defendants stated that, of the 1,176 mortgage loans that backed the certificate that Colonial purchased, 619 were secured by primary residences and 557 were not. Details of each such statement in the securitizations are stated in Item 77 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 77, and alleges as though fully set forth in this paragraph, the contents of Item 77 of the Schedules.

78. These statements were untrue or misleading because (i) the stated number of mortgage loans secured by primary residences was higher than the actual number of loans in that category or (ii) the stated number of mortgage loans not secured by primary residences was lower than the actual number of loans in that category.

### 3. Basis of the allegations above that these statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools were untrue or misleading

79. Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have more favorable terms, including lower interest rates and more lenient underwriting standards, than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not. Plaintiff is informed and believes, and based thereon alleges, that borrowers of many securitized loans did so.

80. A significant number of the properties in the collateral pools of the securitizations that were stated to be primary residences actually were not. Moreover, Plaintiff is informed and believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the loan files of many more of the mortgage loans in the collateral pools.

81. With respect to some of the properties that were stated to be primary residences, the borrower instructed local tax authorities to send the bills for the taxes on the property to the borrower at an address other than the property itself. This is strong evidence that the mortgaged property was not the borrower's primary residence.

82. In some states and counties, the owner of a property is able to designate whether that property is his or her "homestead," which may reduce the taxes on that property or exempt the property from assets available to satisfy the owner's creditors, or both. An owner may designate only one property, which he or she must occupy, as his or her homestead. The fact that an owner in one of these jurisdictions does not designate a property as his or her homestead when he or she can do so is strong evidence that the property was not his or her primary residence. With respect to some of the properties that were stated to be primary residences, the owner could have but did not designate the property as his or her homestead. That omission is strong evidence that the property was not the borrower's primary residence.

83. When a borrower actually occupies a newly mortgaged property, he or she normally notifies entities that send bills to him or her (such as credit card companies, utility companies, and local merchants) to send his or her bills to the address of the newly mortgaged property. Six months after the closing of the mortgage is ample time to complete this process. Six months after the closing of the mortgage, if the borrower is still receiving his or her bills at a different address, it is very likely that the borrower does not occupy the mortgaged property. For each securitization, a credit reporting agency specializing in mortgage loans compared the addresses in

the borrowers' credit reports to the addresses of the mortgaged properties six months after the closing of the mortgage loans. Many borrowers whose mortgage loans were secured by properties that were stated in the loan tapes to be owner-occupied did not receive any bills at the address of the mortgaged property but did receive their bills at another address or addresses. It is very likely that each of these borrowers did not occupy the mortgaged property.

84. In Securitization No. 1, 65 owners of properties that were stated to be primary residences instructed local tax authorities to send the bills for the taxes on those properties to them at different addresses; 82 owners of properties that were stated to be primary residences could have, but did not, designate those properties as their homesteads; and 24 owners of properties that were stated to be primary residences did not receive any of their bills there six months after the mortgages were originated. Eliminating duplicates, for one or more of these reasons, 138 of the 619 properties that were stated to be primary residences actually were not. Thus, the number of properties that were not primary residences was not 557, as defendants stated, but at least 695, a material difference. The numbers of such loans in the collateral pools of the securitizations are stated in Item 84 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 84, and alleges as though fully set forth in this paragraph, the contents of Item 84 of the Schedules.

85. By each of the untrue and misleading statements referred to in paragraph 77, the defendants materially understated the risk of the certificates that they issued, underwrote, or sold.

**C.  Untrue  or  Misleading  Statements  About  the Underwriting Standards of the Originators of the Mortgage Loans in the Collateral Pools**

   **1.  The materiality of underwriting standards and the extent of an originator's disregard of them**

86. Originators of mortgage loans have written standards by which they underwrite applications for loans. An important purpose of underwriting is to ensure that the originator makes mortgage loans only in compliance with those standards and that its underwriting decisions are properly documented. An even more fundamental purpose of underwriting mortgage loans is to ensure that loans are made only to borrowers with credit standing and financial resources to repay the loans, and only against collateral with value, condition, and marketability sufficient to secure the loans. An originator's underwriting standards, and the extent to which the originator does not follow its standards, are important indicators of the risk of mortgage loans made by that originator and of certificates sold in a securitization in which mortgage loans made by that originator are part of the collateral pool. A reasonable investor considers the underwriting standards of originators of mortgage loans in the collateral pool of a

securitization, and whether an originator disregards its standards, important to the decision whether to purchase a certificate in that securitization.

**2.   Untrue or misleading statements about the underwriting standards of originators of the mortgage loans**

87.  In the prospectus supplements, the defendants made statements about the underwriting standards of the originators of the mortgage loans in the collateral pools. Details of each such statement are stated in Item 87 of the Schedules of this Complaint. They included statements that the originators made mortgage loans in compliance with their underwriting standards and made exceptions to those standards only when compensating factors were present. Plaintiff incorporates into this paragraph 87, and alleges as though fully set forth in this paragraph, the contents of Item 87 of the Schedules.

88.  Plaintiff is informed and believes, and based thereon alleges, that these statements were untrue or misleading because the defendants omitted to state that: (a) the originators were disregarding those underwriting standards; (b) the originators were making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originators were making wholesale, rather than case-by-case, exceptions to those underwriting standards; (d) the originators were making mortgage loans that borrowers could not repay; and (e) the originators were failing frequently to follow

quality-assurance practices necessary to detect and prevent fraud intended to circumvent their underwriting standards.

**3.   Basis of the allegations that these statements about the underwriting standards of the originators of the mortgage loans in the collateral pools were untrue or misleading**

**(a)   The deterioration in undisclosed credit characteristics of mortgage loans made by these originators**

89.   Plaintiff is informed and believes, and based thereon alleges, that before and during the time of these securitizations the originators of the loans in the securitizations disregarded their stated underwriting standards. As a result, securitized mortgage loans made between 2004 and the dates of these securitizations have experienced high rates of delinquency and default.

90.   The high rates of delinquency and default were caused not so much by any deterioration in credit characteristics of the loans that were expressly embodied in underwriting standards and disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed to investors.

91.   Plaintiff is informed and believes that what was true about recently securitized mortgage loans in general was true in particular of loans originated by the entities that originated the loans in the collateral pools of these securitizations, as the following figures demonstrate. Taking the originator Bank of America, N.A. as an example, Figure 1 shows the rising incidence of early payment

defaults (or **EPDs**), that is, the percent of loans (by outstanding principal balance) that were originated and sold into securitizations by Bank of America, N.A. and that became 60 or more days delinquent within six months after they were made. An EPD is strong evidence that the originator did not follow its underwriting standards in making the loan. Underwriting standards are intended to ensure that loans are made only to borrowers who can and will make their mortgage payments. Because an EPD occurs so soon after the mortgage loan was made, it is much more likely that the default occurred because the borrower could not afford the payments in the first place (and thus that the underwriting standards were not followed), than because of changed external circumstances unrelated to the underwriting of the mortgage loan (such as that the borrower lost his or her job). The bars in Figure 1 depict the incidence of EPDs in loans originated by Bank of America, N.A. that were sold into securitizations. The steady increase in EPDs is further evidence that the deterioration in the credit quality of those loans was caused by disregard of underwriting standards.



Figure 1: Percent of Loans Originated by Bank of America, N.A. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination

92.  Figure 2 shows the weighted-average disclosed LTVs of the same loans and weighted-average disclosed credit scores of the borrowers. These were nearly constant, showing that the deterioration in the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed factors.



93. Substantially the same facts are true of the mortgage loans originated and sold into securitizations by each of the originators of mortgage loans in the collateral pools of these securitizations. Figures for some of them are presented in Figures 1 and 2 of Exhibits A through D of this Complaint:

| Exhibit | Originator |
|---------|-----------|
| A | Credit Suisse First Boston Corp. and DLJ Mortgage Capital |
| B | Countrywide Home Loans, Inc. |
| C | First Horizon Home Loan Corporation |
| D | Wells Fargo Bank, N.A. |

> **(b)  The poor performance of the loans in these pools demonstrates that the originators disregarded their underwriting guidelines when making these loans.**

94. As noted above, an EPD is evidence that the originator may have disregarded its underwriting standards in making the loan. The mortgage loans in some of the collateral pools of these securitizations experienced EPDs. These EPDs are evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered EPDs are stated in Item 94 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 94, and alleges as though fully set forth in this paragraph, the contents of Item 94 of the Schedules.

95. A high rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have disregarded their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which the borrowers

were ever 90 or more days delinquent in their payments. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. These high rates of delinquencies are strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered delinquencies of 90 days or more are stated in Item 95 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 95, and alleges as though fully set forth in this paragraph, the contents of Item 95 of the Schedules.

96. A second common measure of delinquency is the number of loans on which the borrowers are 30 or more days delinquent at a given point in time. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. These high rates of delinquencies are strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that were 30 or more days delinquent on January 31, 2012, are stated in Item 96 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 96, and alleges as though fully set forth in this paragraph, the contents of Item 96 of the Schedules.

97.  By each of the untrue and misleading statements referred to in paragraph 87 above, the defendants materially understated the risk of the certificates that they issued, underwrote, or sold. Moreover, Plaintiff is informed and believes, and based thereon alleges, that discovery will yield additional evidence that the originators disregarded their underwriting guidelines when making the mortgage loans in the collateral pools of these securitizations.

**D.  The Large Number of Mortgage Loans in the Collateral Pools About Which the Defendants Made Material Untrue or Misleading Statements Made Their Statements About the Ratings of Colonial's Certificates Untrue and Misleading.**

98.  In the prospectus supplements, the defendants made statements about the ratings of the certificates by ratings agencies. They stated that the ratings agencies rated each such certificate triple-A. Details of each such statement are stated in Item 98 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 98, and alleges as though fully set forth in this paragraph, the contents of Item 98 of the Schedules.

99.  The ratings were important to the decision of any reasonable investor whether to purchase the certificates. Many investors, including Colonial, have investment policies that require a certain minimum rating for all investments. The policy of Colonial was to purchase only certificates that were rated at least double-A.

100. These statements by the defendants about the ratings of the certificates they issued, underwrote, or sold were misleading because the defendants omitted to state that the ratings were affected by all of the material untrue or misleading statements about specific mortgage loans in the collateral pools. These include:

(a) loans whose LTVs were materially understated as shown by the AVM;

(b) loans whose LTVs were misleading as a result of undisclosed additional liens;

(c) loans for which the properties were stated to be owner-occupied, but were not; and

(d) loans that suffered EPDs, strong evidence that the originators may have disregarded the underwriting standards in making those loans.

101. In Securitization No. 1, there were 270 loans whose LTVs were materially understated as shown by the AVM, 456 loans whose LTVs were misleading because of undisclosed additional liens, and 138 loans for which the properties were stated to be owner-occupied but were not. Eliminating duplicates, there were 650 loans (or 55.3% of the loans that backed the certificate that Colonial purchased) about which defendants made untrue or misleading statements. The numbers of such loans in the collateral pools of the securitizations are stated in Item 101 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph

101, and alleges as though fully set forth in this paragraph, the contents of Item 101 of the Schedules.

102. Plaintiff is informed and believes, and based thereon alleges, that loan files and other documents available only through discovery will prove that those statements were untrue or misleading with respect to many more loans as well.

103. By these untrue and misleading statements, the defendants materially understated the risk of the certificates that they issued, underwrote, or sold.

## VI. STATUTES OF LIMITATIONS

104. All of the claims in this Complaint are timely. Plaintiff became receiver for Colonial on August 14, 2009. Under 12 U.S.C. § 1821(d)(14), the statutes of limitations on all of Colonial's claims asserted in this Complaint that had not expired as of August 14, 2009, are extended to no less than three years from that date. This Complaint was filed less than three years from August 14, 2009.

105. The statutes of limitations applicable to the claims asserted in this Complaint had not expired as of August 14, 2009, because a reasonably diligent plaintiff would not have discovered until later than August 14, 2008, facts that show that the particular statements referred to in Items 38, 47, 71, 77, 87, and 98 of the Schedules to this Complaint were untrue or misleading. Those are statements about the 14,338 specific mortgage loans in the collateral pools of the securitizations involved in this

action, not about residential mortgage loans or any type of residential mortgage loan (e.g., prime, Alt-A, subprime, etc.) in general. A reasonably diligent plaintiff did not have access until after August 14, 2008, to facts about those specific loans that show that the statements that defendants made about those specific loans were untrue or misleading. A reasonably diligent plaintiff did not have access to the loan files compiled by the originators of those specific mortgage loans nor to records maintained by the servicers of those specific mortgage loans (from either or both of which a reasonably diligent plaintiff may have discovered facts that show that the statements that defendants made about those specific loans were untrue or misleading) because originators and servicers of loans and securitization trustees do not make those files available to certificateholders. Moreover, on and prior to August 14, 2008, there were not available to a reasonably diligent plaintiff, even at considerable expense, data about those specific loans that show that the statements that defendants made about those specific loans were untrue or misleading. Such data became available for the first time in early 2010.

106. When Colonial purchased the certificates involved in this action, all of them were rated triple-A, the highest possible rating, by at least two of Fitch, Moody's, and Standard & Poor's, all Nationally Recognized Statistical Rating Organizations (**NRSROs**) accredited by the

Securities and Exchange Commission. Sponsors of securitizations submitted to the NRSROs the same information about the loans in the collateral pools of proposed securitizations that they included in the prospectus supplements for those securitizations, including in particular statements of the type referred to in Items 38, 47, 71, 77, 87, and 98 of the Schedules to this Complaint. The NRSROs used and relied on that information in rating the certificates to be issued in each securitization.

107. The NRSROs monitored the certificates that they rated after those certificates were issued. If an NRSRO discovers facts that show that there was an untrue or misleading statement about a material fact in the information submitted to it for its use in rating a certificate, then the NRSRO will withdraw its rating of that certificate while it considers the impact of the untrue or misleading statement, or it will downgrade the rating of the certificate, usually to a rating below investment grade.

108. As noted above, all of the certificates involved in this action were rated triple-A at issuance by at least two of Fitch, Moody's, and Standard & Poor's. Not one of those NRSROs withdrew any of those ratings, or downgraded any of them to below investment grade, before August 14, 2008. The date on which each certificate was first

downgraded below investment grade is stated in Item 38 of the Schedules.

109. If a reasonably diligent plaintiff would have discovered before August 14, 2008, facts that show that the particular statements referred to in Items 38, 47, 71, 77, 87, and 98 of the Schedules to this Complaint were untrue or misleading, then the NRSROs, which were monitoring the certificates and are much more sophisticated than a reasonably diligent plaintiff, would also have discovered such facts and withdrawn or downgraded their ratings on the certificates to below investment grade. The fact that none of the NRSROs did so demonstrates that, before August 14, 2008, a reasonably diligent plaintiff could not have discovered facts that show that those statements were untrue or misleading.

## VII.  CAUSES OF ACTION

### A.  Untrue or Misleading Statements in the Sale of Securities Under Section 8-6-19(a)(2) of the ASA

110. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 109.

111. BAS underwrote and sold to Colonial two certificates in Securitizations Nos. 1 and 2. BAS sent communications and solicitations to Colonial in Montgomery, Alabama, for the purpose of inducing Colonial to purchase the certificates in Securitizations Nos. 1 and 2. The sale of these certificates occurred in Alabama because employees or agents of BAS directed communications about the

certificates and solicitations to purchase the certificates
to Colonial there, and because Colonial received those
communications and solicitations there.

112. In doing the acts alleged in the sale to Colonial
of the certificates in Securitizations Nos. 1 and 2, BAS
violated Section 8-6-19(a)(2) of the ASA by offering or
selling securities in this State by means of written
communications that included untrue statements of material
fact or omitted to state material facts necessary in order
to make the statements made, in the light of the
circumstances under which they were made, not misleading.

113. Citigroup underwrote and sold to Colonial four
certificates in Securitizations Nos. 3, 5, 6, and 11.
Citigroup sent communications and solicitations to Colonial
in Montgomery, Alabama, for the purpose of inducing
Colonial to purchase the certificates in Securitizations
Nos. 3, 5, 6, and 11. The sale of these certificates
occurred in Alabama because employees or agents of
Citigroup directed communications about the certificates
and solicitations to purchase the certificates to Colonial
there, and because Colonial received those communications
and solicitations there.

114. In doing the acts alleged in the sale to Colonial
of the certificates in Securitizations Nos. 3, 5, 6, and
11, Citigroup violated Section 8-6-19(a)(2) of the ASA by
offering or selling securities in this State by means of
written communications that included untrue statements of

material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

115. Credit Suisse underwrote and sold to Colonial six certificates in Securitizations Nos. 4, 7, 8, 9, and 12, including two certificates in Securitization No. 8. Credit Suisse sent communications and solicitations to Colonial in Montgomery, Alabama, for the purpose of inducing Colonial to purchase the certificates in Securitizations Nos. 4, 7, 8, 9, and 12. The sale of these certificates occurred in Alabama because employees or agents of Credit Suisse directed communications about the certificates and solicitations to purchase the certificates to Colonial there, and because Colonial received those communications and solicitations there.

116. In doing the acts alleged in the sale to Colonial of the certificates in Securitizations Nos. 4, 7, 8, 9, and 12, Credit Suisse violated Section 8-6-19(a)(2)of the ASA by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

117. HSBC underwrote and sold to Colonial two certificates in Securitization No. 10. HSBC sent communications and solicitations to Colonial in Montgomery, Alabama, for the purpose of inducing Colonial to purchase

the certificates in Securitization No. 10. The sale of
these certificates occurred in Alabama because employees or
agents of HSBC directed communications about the
certificates and solicitations to purchase the certificates
to Colonial there, and because Colonial received those
communications and solicitations there.

118. In doing the acts alleged in the sale to Colonial
of the certificates in Securitization No. 10, HSBC violated
Section 8-6-19(a)(2) of the ASA by offering or selling
securities in this State by means of written communications
that included untrue statements of material fact or omitted
to state material facts necessary in order to make the
statements made, in the light of the circumstances under
which they were made, not misleading.

119. BOAMS was the depositor of Securitization No. 1
and therefore is the issuer of the certificate in
Securitization No. 1 that Colonial purchased. The sale of
this certificate occurred in Alabama because employees or
agents of BAS directed communications about the certificate
and solicitations to purchase the certificate to Colonial
there, and because Colonial received those communications
and solicitations there.

120. BOAMS prepared and signed the registration
statement for the certificates in Securitization No. 1 for
the purpose of soliciting investors, including Colonial, to
purchase certificates when they were initially offered to

the public, motivated at least in part by its own financial interest or that of the direct seller.

121. The sale was in the initial offering of the certificate and the certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), BOAMS is considered to have offered or sold the certificate to Colonial.

122. In doing the acts alleged in the offer or sale to Colonial of the certificate in Securitization No. 1, BOAMS violated Section 8-6-19(a)(2) of the ASA by offering or selling a security in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

123. BAFC was the depositor of Securitization No. 2 and therefore is the issuer of the certificate in Securitization No. 2 that Colonial purchased. The sale of this certificate occurred in Alabama because employees or agents of BAS directed communications about the certificate and solicitations to purchase the certificate to Colonial there, and because Colonial received those communications and solicitations there.

124. BAFC prepared and signed the registration statement for the certificates in Securitization No. 2 for the purpose of soliciting investors, including Colonial, to purchase certificates when they were initially offered to

the public, motivated at least in part by its own financial interest or that of the direct seller.

125. The sale was in the initial offering of the certificate and the certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), BAFC is considered to have offered or sold the certificate to Colonial.

126. In doing the acts alleged in the offer or sale to Colonial of the certificate in Securitization No. 2, BAFC violated Section 8-6-19(a)(2) of the ASA by offering or selling a security in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

127. CMLTI was the depositor of Securitization No. 3 and therefore is the issuer of the certificate in Securitization No. 3 that Colonial purchased. The sale of this certificate occurred in Alabama because employees or agents of Citigroup directed communications about the certificate and solicitations to purchase the certificate to Colonial there, and because Colonial received those communications and solicitations there.

128. CMLTI prepared and signed the registration statement for the certificates in Securitization No. 3 for the purpose of soliciting investors, including Colonial, to purchase certificates when they were initially offered to

the public, motivated at least in part by its own financial interest or that of the direct seller.

129. The sale was in the initial offering of the certificate and the certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), CMLTI is considered to have offered or sold the certificate to Colonial.

130. In doing the acts alleged in the offer or sale to Colonial of the certificate in Securitization No. 3, CMLTI violated Section 8-6-19(a)(2) of the ASA by offering or selling a security in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

131. CMSI was the depositor of Securitizations Nos. 4, 5, and 6 and therefore is the issuer of the certificates in Securitizations Nos. 4, 5, and 6 that Colonial purchased. The sale of these certificates occurred in Alabama because employees or agents of Credit Suisse and Citigroup directed communications about the certificates and solicitations to purchase the certificates to Colonial there, and because Colonial received those communications and solicitations there.

132. CMSI prepared and signed the registration statements for the certificates in Securitizations Nos. 4, 5, and 6 for the purpose of soliciting investors, including

Colonial, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

133. The sale was in the initial offering of the certificates and each certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), CMSI is considered to have offered or sold the certificates to Colonial.

134. In doing the acts alleged in the offer or sale to Colonial of the certificates in Securitizations Nos. 4, 5, and 6, CMSI violated Section 8-6-19(a)(2) of the ASA by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

135. CSFB Mortgage Securities was the depositor of Securitizations Nos. 7, 8, and 9 and therefore is the issuer of the certificates in Securitizations Nos. 7, 8, and 9 that Colonial purchased. The sale of these certificates occurred in Alabama because employees or agents of Credit Suisse directed communications about the certificates and solicitations to purchase the certificates to Colonial there, and because Colonial received those communications and solicitations there.

136. CSFB Mortgage Securities prepared and signed the registration statements for the certificates in

Securitizations Nos. 7, 8, and 9 for the purpose of soliciting investors, including Colonial, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

137. The sale was in the initial offering of the certificates and each certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), CSFB Mortgage Securities is considered to have offered or sold the certificates to Colonial.

138. In doing the acts alleged in the offer or sale to Colonial of the certificates in Securitizations Nos. 7, 8, and 9, CSFB Mortgage Securities violated Section 8-6-19(a)(2) of the ASA by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

139. FHASI was the depositor of Securitizations Nos. 10, 11, and 12 and therefore is the issuer of the certificates in Securitizations Nos. 10, 11, and 12 that Colonial purchased. The sale of these certificates occurred in Alabama because employees or agents of HSBC, Citigroup, and Credit Suisse directed communications about the certificates and solicitations to purchase the certificates

to Colonial there, and because Colonial received those communications and solicitations there.

140. FHASI prepared and signed the registration statements for the certificates in Securitizations Nos. 10, 11, and 12 for the purpose of soliciting investors, including Colonial, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

141. The sale was in the initial offering of the certificates and each certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), FHASI is considered to have offered or sold the certificates to Colonial.

142. In doing the acts alleged in the offer or sale to Colonial of the certificates in Securitizations Nos. 10, 11, and 12, FHASI violated Section 8-6-19(a)(2) of the ASA by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

143. Plaintiff has disposed of all of the certificates.

144. Under Section 8-6-19 of the ASA, Plaintiff is entitled to recover the consideration paid for each of these certificates, plus interest at the legal rate from the date of purchase to the date of disposition, minus the amount of income received on the certificate, minus the

greater of the value of the security when Plaintiff disposed of it or the consideration that Plaintiff received for the security.

### B. Liability as a Controlling Person Under Section 8-6-19(c) of the ASA

145. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 144.

146. BAC, by or through stock ownership, agency, or otherwise, controlled BAFC within the meaning of Section 8-6-19(c) of the ASA.

147. In doing the acts alleged, BAFC violated Section 8-6-19(a)(2) of the ASA by offering or selling the certificate in Securitization No. 2 that Colonial purchased.

148. BAC is therefore jointly and severally liable with and to the same extent as BAFC.

149. Citigroup FP, by or through stock ownership, agency, or otherwise, controlled CMLTI within the meaning of Section 8-6-19(c) of the ASA.

150. In doing the acts alleged, CMLTI violated Section 8-6-19(a)(2) of the ASA by offering or selling the certificate in Securitization No. 3 that Colonial purchased.

151. Citigroup FP is therefore jointly and severally liable with and to the same extent as CMLTI.

152. CitiMortgage, by or through stock ownership, agency, or otherwise, controlled CMSI within the meaning of Section 8-6-19(c) of the ASA.

153. In doing the acts alleged, CMSI violated Section 8-6-19(a)(2) of the ASA by offering or selling the certificates in Securitizations Nos. 4, 5, and 6 that Colonial purchased.

154. CitiMortgage is therefore jointly and severally liable with and to the same extent as CMSI.

155. Credit Suisse Management, by or through stock ownership, agency, or otherwise, controlled CSFB Mortgage Securities within the meaning of Section 8-6-19(c) of the ASA.

156. In doing the acts alleged, CSFB Mortgage Securities violated Section 8-6-19(a)(2) of the ASA by offering or selling the certificates in Securitizations Nos. 7, 8, and 9 that Colonial purchased.

157. Credit Suisse Management is therefore jointly and severally liable with and to the same extent as CSFB Mortgage Securities.

158. FHHLC, by or through stock ownership, agency, or otherwise, controlled FHASI within the meaning of Section 8-6-19(c) of the ASA.

159. In doing the acts alleged, FHASI violated Section 8-6-19(a)(2) of the ASA by offering or selling the certificates in Securitizations Nos. 10, 11, and 12 that Colonial purchased.

160. FHHLC is therefore jointly and severally liable with and to the same extent as FHASI.

## C.  Untrue or Misleading Statements in the Sale of Securities Under Section 12(a)(2) of the 1933 Act

161. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 160.

162. Colonial purchased the certificates in Securitizations Nos. 1 and 2 that BAS sold to Colonial when they were initially offered to the public.

163. BAS solicited Colonial to purchase these certificates, and sold the certificates to Colonial, by means of the prospectus supplements and other written offering materials and oral communications.

164. The prospectus supplements and other written offering materials and oral communications that BAS sent to Colonial contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

165. Colonial did not know when it purchased the certificates in Securitizations Nos. 1 and 2 that the statements in the prospectus supplements and other written offering materials and oral communications that BAS sent to Colonial were untrue or misleading.

166. In doing the acts alleged in the sale to Colonial of the certificates in Securitizations Nos. 1 and 2, BAS violated Section 12(a)(2) of the 1933 Act.

167. Colonial purchased the certificates in Securitizations Nos. 3, 5, 6, and 11 that Citigroup sold to Colonial when they were initially offered to the public.

168. Citigroup solicited Colonial to purchase these certificates, and sold the certificates to Colonial, by means of the prospectus supplements and other written offering materials and oral communications.

169. The prospectus supplements and other written offering materials and oral communications that Citigroup sent to Colonial contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

170. Colonial did not know when it purchased the certificates in Securitizations Nos. 3, 5, 6, and 11 that the statements in the prospectus supplements and other written offering materials and oral communications that Citigroup sent to Colonial were untrue or misleading.

171. In doing the acts alleged in the sale to Colonial of the certificates in Securitizations Nos. 3, 5, 6, and 11, Citigroup violated Section 12(a)(2) of the 1933 Act.

172. Colonial purchased the certificates in Securitizations Nos. 4, 7, 8, 9, and 12 that Credit Suisse sold to Colonial when they were initially offered to the public.

173. Credit Suisse solicited Colonial to purchase these certificates, and sold the certificates to Colonial,

by means of the prospectus supplements and other written offering materials and oral communications.

174. The prospectus supplements and other written offering materials and oral communications that Credit Suisse sent to Colonial contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

175. Colonial did not know when it purchased the certificates in Securitizations Nos. 4, 7, 8, 9, and 12 that the statements in the prospectus supplements and other written offering materials and oral communications that Credit Suisse sent to Colonial were untrue or misleading.

176. In doing the acts alleged in the sale to Colonial of the certificates in Securitizations Nos. 4, 7, 8, 9, and 12, Credit Suisse violated Section 12(a)(2) of the 1933 Act.

177. Colonial purchased two certificates in Securitization No. 10 that HSBC sold to Colonial when they were initially offered to the public.

178. HSBC solicited Colonial to purchase these certificates, and sold the certificates to Colonial, by means of the prospectus supplement and other written offering materials and oral communications.

179. The prospectus supplement and other written offering materials and oral communications that HSBC sent to Colonial contained untrue statements of material fact

and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

180. Colonial did not know when it purchased the certificates in Securitization No. 10 that the statements in the prospectus supplement and other written offering materials and oral communications that HSBC sent to Colonial were untrue or misleading.

181. In doing the acts alleged in the sale to Colonial of the certificates in Securitization No. 10, HSBC violated Section 12(a)(2) of the 1933 Act.

182. BOAMS was the depositor of Securitization No. 1 and therefore is the issuer of the certificate that Colonial purchased.

183. BOAMS prepared and signed the registration statement for the certificates in Securitization No. 1 for the purpose of soliciting investors, including Colonial, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

184. This sale was in the initial offering of the certificate and the certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), BOAMS is considered to have offered or sold the certificate to Colonial.

185. In doing the acts alleged in the offer or sale to Colonial of the certificate in Securitization No. 1, BOAMS violated section 12(a)(2) of the 1933 Act.

186. BAFC was the depositor of Securitization No. 2 and therefore is the issuer of the certificate that Colonial purchased.

187. BAFC prepared and signed the registration statement for the certificates in Securitization No. 2 for the purpose of soliciting investors, including Colonial, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

188. This sale was in the initial offering of the certificate and the certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), BAFC is considered to have offered or sold the certificate to Colonial.

189. In doing the acts alleged in the offer or sale to Colonial of the certificate in Securitization No. 2, BAFC violated section 12(a)(2) of the 1933 Act.

190. CMLTI was the depositor of Securitization No. 3 and therefore is the issuer of the certificate that Colonial purchased.

191. CMLTI prepared and signed the registration statement for the certificates in Securitization No. 3 for the purpose of soliciting investors, including Colonial, to purchase certificates when they were initially offered to

the public, motivated at least in part by its own financial interest or that of the direct seller.

192. This sale was in the initial offering of the certificate and the certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), CMLTI is considered to have offered or sold the certificate to Colonial.

193. In doing the acts alleged in the offer or sale to Colonial of the certificate in Securitization No. 3, CMLTI violated section 12(a)(2) of the 1933 Act.

194. CMSI was the depositor of Securitizations Nos. 4, 5, and 6, and therefore is the issuer of the certificates that Colonial purchased.

195. CMSI prepared and signed the registration statements for the certificates in Securitizations Nos. 4, 5, and 6, for the purpose of soliciting investors, including Colonial, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

196. These sales were in the initial offering of the certificates and each certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), CMSI is considered to have offered or sold the certificates to Colonial.

197. In doing the acts alleged in the offer or sale to Colonial of the certificates in Securitizations Nos. 4, 5, and 6, CMSI violated section 12(a)(2) of the 1933 Act.

198. CSFB Mortgage Securities was the depositor of Securitizations Nos. 7, 8, and 9, and therefore is the issuer of the certificates that Colonial purchased.

199. CSFB Mortgage Securities prepared and signed the registration statements for the certificates in Securitizations Nos. 7, 8, and 9, for the purpose of soliciting investors, including Colonial, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

200. These sales were in the initial offering of the certificates and each certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), CSFB Mortgage Securities is considered to have offered or sold the certificates to Colonial.

201. In doing the acts alleged in the offer or sale to Colonial of the certificates in Securitizations Nos. 7, 8, and 9, CSFB Mortgage Securities violated section 12(a)(2) of the 1933 Act.

202. FHASI was the depositor of Securitizations Nos. 10, 11, and 12, and therefore is the issuer of the certificates that Colonial purchased.

203. FHASI prepared and signed the registration statements for the certificates in Securitizations Nos. 10, 11, and 12, for the purpose of soliciting investors, including Colonial, to purchase certificates when they were

initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

204. These sales were in the initial offering of the certificates and each certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), FHASI is considered to have offered or sold the certificates to Colonial.

205. In doing the acts alleged in the offer or sale to Colonial of the certificates in Securitizations Nos. 10, 11, and 12, FHASI violated section 12(a)(2) of the 1933 Act.

206. Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on allegations of strict liability or negligence under the 1933 Act.

207. When it failed on August 14, 2009, Colonial had not discovered that the defendants made untrue or misleading statements about the certificates. Plaintiff discovered that the defendants made untrue or misleading statements in the sale of each security in the course of its investigation in 2012.

208. Plaintiff has suffered a loss on each of these certificates.

209. Plaintiff is entitled to recover damages.

**D.   Untrue or Misleading Statements in a Registration Statement Under Section 11 of the 1933 Act**

210. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 209.

211. BOAMS is the depositor of Securitization No. 1 and therefore is the issuer of the certificate in Securitization No. 1 that Colonial purchased. In doing the acts alleged, BOAMS violated Section 11 of the 1933 Act in connection with issuing the certificate in Securitization No. 1.

212. BAFC is the depositor of Securitization No. 2 and therefore is the issuer of the certificate in Securitization No. 2 that Colonial purchased. In doing the acts alleged, BAFC violated Section 11 of the 1933 Act in connection with issuing the certificate in Securitization No. 2.

213. CMLTI is the depositor of Securitization No. 3 and therefore is the issuer of the certificate in Securitization No. 3 that Colonial purchased. In doing the acts alleged, CMLTI violated Section 11 of the 1933 Act in connection with issuing the certificate in Securitization No. 3.

214. CMSI is the depositor of Securitizations Nos. 4, 5, and 6 and therefore is the issuer of the certificates in Securitizations Nos. 4, 5, and 6 that Colonial purchased. In doing the acts alleged, CMSI violated Section 11 of the

1933 Act in connection with issuing the certificates in Securitizations Nos. 4, 5, and 6.

215. CSFB Mortgage Securities is the depositor of Securitizations Nos. 7, 8, and 9 and therefore is the issuer of the certificates in Securitizations Nos. 7, 8, and 9 that Colonial purchased. In doing the acts alleged, CSFB Mortgage Securities violated Section 11 of the 1933 Act in connection with issuing the certificates in Securitizations Nos. 7, 8, and 9.

216. FHASI is the depositor of Securitizations Nos. 10, 11, and 12 and therefore is the issuer of the certificates in Securitizations 10, 11, and 12 that Colonial purchased. In doing the acts alleged, FHASI violated Section 11 of the 1933 Act in connection with issuing the certificates in Securitizations Nos. 10, 11, and 12.

217. BAS underwrote Securitizations Nos. 1, 2, 6, 11, and 12. In doing the acts alleged, BAS violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 1, 2, 6, 11, and 12.

218. Citigroup underwrote Securitizations Nos. 3, 5, 6, and 11. In doing the acts alleged, Citigroup violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 3, 5, 6, and 11.

219. Credit Suisse underwrote Securitizations Nos. 4, 7, 8, 9 and 12. In doing the acts alleged, Credit Suisse violated Section 11 of the 1933 Act in connection with

underwriting the certificates in Securitizations Nos. 4, 7, 8, 9 and 12.

220. FTN underwrote Securitizations Nos. 10, 11, and 12. In doing the acts alleged, FTN violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 10, 11, and 12.

221. HSBC underwrote Securitization No. 10. In doing the acts alleged, HSBC violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitization No. 10.

222. The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 38 of the Schedules.

223. The registration statements, as amended by the prospectus supplements, contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. These untrue and misleading statements included all of the untrue and misleading statements described in paragraphs 42 through 103.

224. Colonial purchased each certificate before the issuer made generally available an earning statement covering a period of at least twelve months.

225. Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging

fraud or intentional or reckless conduct. This cause of action is based solely on allegations of strict liability or negligence under the 1933 Act.

226. Colonial did not know when it purchased the certificates that the statements in the registration statements, as amended by the prospectus supplements, were untrue or misleading.

227. When it failed on August 14, 2009, Colonial had not discovered that the defendants made untrue or misleading statements about the certificates. Plaintiff discovered that the defendants made untrue or misleading statements about each security in the course of its investigation in 2012.

228. Colonial has suffered a loss on each of these certificates.

229. Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77k(e).

### E.   Liability as a Controlling Person Under Section 15 of the 1933 Act

230. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 229.

231. BAC, by or through stock ownership, agency, or otherwise, controlled BAFC within the meaning of Section 15 of the 1933 Act.

232. In doing the acts alleged, BAFC violated Sections 11 and 12(a)(2) of the 1933 Act by issuing, offering, or

selling certain of the certificates that Colonial purchased when they were initially offered to the public.

233. BAC is therefore jointly and severally liable with and to the same extent as BAFC.

234. Citigroup FP, by or through stock ownership, agency, or otherwise, controlled CMLTI within the meaning of Section 15 of the 1933 Act.

235. In doing the acts alleged, CMLTI violated Sections 11 and 12(a)(2) of the 1933 Act by issuing, offering, or selling certain of the certificates that Colonial purchased when they were initially offered to the public.

236. Citigroup FP is therefore jointly and severally liable with and to the same extent as CMLTI.

237. CitiMortgage, by or through stock ownership, agency, or otherwise, controlled CMSI within the meaning of Section 15 of the 1933 Act.

238. In doing the acts alleged, CMSI violated Sections 11 and 12(a)(2) of the 1933 Act by issuing, offering, or selling certain of the certificates that Colonial purchased when they were initially offered to the public.

239. CitiMortgage is therefore jointly and severally liable with and to the same extent as CMSI.

240. Credit Suisse Management, by or through stock ownership, agency, or otherwise, controlled CSFB Mortgage Securities within the meaning of Section 15 of the 1933 Act.

241. In doing the acts alleged, CSFB Mortgage Securities violated Sections 11 and 12(a)(2) of the 1933 Act by issuing, offering, or selling certain of the certificates that Colonial purchased when they were initially offered to the public.

242. Credit Suisse Management is therefore jointly and severally liable with and to the same extent as CSFB Mortgage Securities.

243. FHHLC, by or through stock ownership, agency, or otherwise, controlled FHASI within the meaning of Section 15 of the 1933 Act.

244. In doing the acts alleged, FHASI violated Sections 11 and 12(a)(2) of the 1933 Act by issuing, offering, or selling certain of the certificates that Colonial purchased when they were initially offered to the public.

245. FHHLC is therefore jointly and severally liable with and to the same extent as FHASI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against defendants for damages in an amount to be determined at trial, but not less than $149.9 million, plus attorneys' fees, costs of court, and pre- and post-judgment interest at the appropriate allowable rates. Plaintiff further requests that the Court order any and all other relief at law and in equity to which Plaintiff is entitled.

**JURY DEMAND**

**Plaintiff demands a trial by jury of all issues**

**triable by jury.**


Dated: August 10, 2012
      Montgomery, Alabama

*Denn R. Bailey*

Digitally signed by DRB
DN: cn=DRB, o=Rushton Stakely,
ou=Litigation,
email=drb@rushtonstakely.com,
c=US
Date: 2012.08.10 13:36:44 -05'00'

Dennis R. Bailey (BAI028)
R. Austin Huffaker (HUF006)
J. Evans Bailey (BAI062)

Of Counsel:

RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
184 Commerce Street
Post Office Box 270
Montgomery, Alabama 36101-0270
(334) 206-3234 (phone)
(334) 481-0031 (fax)
drb@rushtonstakely.com (Dennis Bailey E-mail)
rah2@rushtonstakely.com (Austin Huffaker E-mail)
ebailey@rushtonstakely.com (Evans Bailey E-mail)

Of Counsel:

David J. Grais (*pro hac vice* to be submitted)
Mark B. Holton (*pro hac vice* to be submitted)
GRAIS & ELLSWORTH LLP
1211 Avenue of the Americas
New York, New York 10036
(212) 755-0100 (phone)
(212) 755-0052 (fax)

      Attorneys for Plaintiff Federal
      Deposit Insurance Corporation as
      Receiver for Colonial Bank

**Defendants may be served via certified mail at:**

| | |
|---|---|
| Banc of America Funding Corporation | The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19801 |
| Bank of America Corporation | The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19801 |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | CT Corporation System<br>2 North Jackson Street, Suite 605<br>Montgomery, Alabama 36104 |
| Banc of America Mortgage Securities, Inc. | The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19801 |
| Citicorp Mortgage Securities, Inc. | CT Corporation System<br>111 Eighth Avenue<br>New York, New York 10011 |
| CitiMortgage, Inc. | CT Corporation System<br>2 North Jackson Street, Suite 605<br>Montgomery, Alabama 36104 |
| Citigroup Mortgage Loan Trust Inc. | The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19801 |
| Citigroup Financial Products Inc. | Corporation Service Company<br>80 State Street<br>Albany, New York 12207 |
| Citigroup Global Markets Inc. | CT Corporation System<br>2 North Jackson Street, Suite 605<br>Montgomery, Alabama 36104 |
| Credit Suisse First Boston Mortgage Securities Corp. | Corporation Service Company<br>2711 Centerville Road, Suite 400<br>Wilmington, Delaware 19808 |
| Credit Suisse Management LLC | Corporation Service Company<br>80 State Street<br>Albany, New York 12207-2543 |

| | |
|---|---|
| Credit Suisse Securities (USA) LLC | CSC Lawyers Incorporating Service Inc. 150 S. Perry Street Montgomery, Alabama 36104 |
| First Horizon Asset Securities Inc. | The Corporation Trust Company Corporation Trust Center 1209 Orange Street Wilmington, Delaware 19801 |
| First Horizon Home Loan Corporation | CT Corporation System 2 North Jackson Street, Suite 605 Montgomery, Alabama 36104 |
| FTN Financial Securities Corp. | C/O Robert Thatcher FTN Financial Securities Corp. One St. Louis Centre, Suite 3000 Mobile, Alabama 36602 |
| HSBC Securities (USA) Inc. | CT Corporation System 111 Eighth Avenue New York, New York 10011 |

## EXHIBIT A TO THE COMPLAINT



Figure 1: Percent of Loans Originated by Credit Suisse First Boston Corp., DLJ Mortgage Capital Inc., or their Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Credit Suisse First Boston Corp., DLJ Mortgage Capital Inc., or their Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

## EXHIBIT B TO THE COMPLAINT



Figure 1: Percent of Loans Originated by Countrywide Home Loans, Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Countrywide Home Loans, Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

## EXHIBIT C TO THE COMPLAINT



Figure 1: Percent of Loans Originated by First Horizon Home Loan Corporation or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by First Horizon Home Loan Corporation or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

## EXHIBIT D TO THE COMPLAINT



Figure 1: Percent of Loans Originated by Wells Fargo Bank, N.A. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Wells Fargo Bank, N.A. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

## SCHEDULE 1 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against defendants BOAMS and BAS.

**Item 38. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial:** Banc of America.

**(b) Description of the trust:** Banc of America Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-11 was a securitization in November 2005 of 2,411 mortgage loans, in four groups. BOAMS was the issuer of the securities in the trust. Bank of America, N.A. originated or acquired the mortgage loans in the collateral pool of this securitization. BOAA 2005-11 Pros. Sup. S-8 and S-26.

**(c) Description of the certificate(s) that Colonial purchased:** BAS was the underwriter of the security that Colonial purchased. BAS offered and sold to Colonial a senior certificate in this securitization, in tranche 1-CB-5, for which Colonial paid $7,560,971 plus accrued interest on January 27, 2006. Colonial's certificate was primarily paid by the 1,176 mortgage loans in Loan Group 1.

**(d) Ratings of the certificate(s) when Colonial purchased them:** Moody's: Aaa; Fitch: AAA.

**(e) Current ratings of the certificate(s):** Moody's: Caa2; Fitch: C.

**(f) Date on which the certificate(s) were downgraded below investment grade**: February 20, 2009.

**(g) URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1207409/00011931 2505233287/d424b5.htm

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by BOAMS with the SEC on form S-3 on September 7, 2004. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

## Item 47. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, BOAMS and BAS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) As of the Cut-Off Date, the original loan-to-value ratios of the Group 1 Mortgage Loans ranged from 10.03% to 103%, with a weighted average of 72.68%. BOAA 2005-11 Pros. Sup. S-8 and S-29.

**SCHEDULE 1 OF THE COMPLAINT**                          **Page 2**

(b) As of the Cut-Off Date, the original loan-to-value ratios of all of the loans in the collateral pool ranged from 9.78% to 103%, with a weighted average of 72.37%. BOAA 2005-11 Pros. Sup. S-10 and S-49.

(c) "As of the Cut-off Date, no Mortgage Loan will have a Loan-to-Value Ratio of more than 103.00%." BOAA 2005-11 Pros. Sup. S-28.

(d) The original loan-to-value ratios of the Group 1 Discount Mortgage Loans ranged from 10.53% to 100%, with a weighted average of 73.34%. BOAA 2005-11 Pros. Sup. S-29.

(e) The original LTVs of the Group 1 Premium Mortgage Loans ranged from 10.03% to 100%, with a weighted average of 72.47%. BOAA 2005-11 Pros. Sup. S-29.

(f) The original LTVs of all of the Discount Mortgage Loans in the collateral pool ranged from 10.53% to 103%, with a weighted average of 72.71%. BOAA 2005-11 Pros. Sup. S-49.

(g) The original LTVs of all of the Premium Mortgage Loans in the collateral pool ranged from 9.78% to 103%, with a weighted average of 72.20%. BOAA 2005-11 Pros. Sup. S-49.

(h) In the section of the prospectus supplement entitled "The Mortgage Pool," BOAMS and BAS presented a table, entitled "Original Loan-to-Value Ratios," for the Group 1 Mortgage Loans. This table divided the

**SCHEDULE 1 OF THE COMPLAINT**                    **Page 3**

Group 1 Mortgage Loans into 19 categories of original LTV (for example, 10.01% to 15%, 15.01% to 20%, 20.01% to 25%, etc.). The table contained untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding as of the Cut-Off Date in each of these categories. BOAA 2005-11 Pros. Sup. S-32.

(i) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Group 1 Mortgage Loans is expected to be approximately 72.68%." BOAA 2005-11 Pros. Sup. S-32.

(j) In "The Mortgage Pool" section, BOAMS and BAS presented another table entitled "Original Loan-to-Value Ratios." This table divided all of the mortgage loans in the collateral pool into 20 categories of original LTV (for example, 5.01% to 10%, 10.01% to 15%, 15.01% to 20%, etc.). The table contained untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding as of the Cut-Off Date in each of these categories. BOAA 2005-11 Pros. Sup. S-53.

(k) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Mortgage Loans is expected to be approximately 72.37%." BOAA 2005-11 Pros. Sup. S-53.

**SCHEDULE 1 OF THE COMPLAINT**                    **Page 4**

**Item 56. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (Loan Group 1) | 1,176 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 270 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $10,317,069 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 118 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,356,582 |
| Number of loans with LTVs over 100%, as stated by defendants | 3 |
| Number of loans with LTVs over 100%, as determined by the model | 50 |
| Weighted-average LTV, as stated by defendants | 72.68% |
| Weighted-average LTV, as determined by the model | 81.1% |

**Item 62. Undisclosed additional liens in Loan Group 1:**

   **(a)  Minimum number of properties with additional liens:** 456

   **(b)  Weighted-average CLTV with additional liens:** 78.9%

**Item 77. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

   In the prospectus supplement, BOAMS and BAS made the following statements about the occupancy status of

the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 47, BOAMS and BAS presented a table entitled "Occupancy of Mortgaged Properties." This table divided the mortgage loans in Group 1 into the categories "Primary Residence," "Investor Property," and "Second Home." The table contained untrue and misleading statements about the number of mortgage loans, the aggregate stated principal balance outstanding, and the percent of aggregate principal balance outstanding as of the Cut-Off Date in each of these categories. BOAA 2005-11 Pros. Sup. S-30.

(b) In the "Occupancy of Mortgaged Properties" table, BOAMS and BAS stated that of the 1,176 mortgage loans in Group 1, 619 were secured by primary residences and 557 were not. BOAA 2005-11 Pros. Sup. S-30.

**Item 84. Details of properties in Loan Group 1 that were stated to be owner-occupied, but were not:**

**(a) Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 65

**(b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 82

    (c)   **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 24

    (d)   **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 138

**Item 87. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 24 through 28 of the prospectus, BOAMS and BAS made statements about the underwriting guidelines of Bank of America, N.A. All of those statements are incorporated herein by reference.

One of those statements was that: "These underwriting standards applied by Bank of America in originating or acquiring mortgage loans are intended to evaluate the applicants' repayment ability, credit standing and assets available for downpayment, closing costs and cash reserves. Additionally, guidelines are established regarding the adequacy of the property as collateral for the loan requested." BOAA 2005-11 Pros. 24.

Another one of these statements was that: "Bank of America will consider a mortgage loan to be originated in accordance with a given set of guidelines if, based on an overall qualitative evaluation, the loan is in substantial compliance with such underwriting guidelines. Even if one or more specific criteria

included in such underwriting guidelines were not satisfied, if other factors compensated for the standards that were not satisfied, the mortgage loan may be considered to be in substantial compliance with the underwriting guidelines." BOAA 2005-11 Pros. 24.

**Item 95. 90+ days delinquencies in Loan Group 1:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 159

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 13.5%

**Item 96. 30+ days delinquencies in Loan Group 1:**

    **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 133

    **(b) Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 11.3%

**Item 98. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-4 and S-120 of the prospectus supplement, BOAMS and BAS made statements about the ratings assigned to the certificates issued in this securitization. BOAMS and BAS stated that Colonial's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Fitch Ratings. BOAA 2005-11 Pros. Sup. 4. These were the highest ratings available from these two rating agencies.

BOAMS and BAS also stated: "At their issuance, each class of Offered Certificates is required to

receive from Moody's Investors Service, Inc. (Moody's) and Fitch Ratings ("Fitch") at least the rating set forth in . . . this Prospectus Supplement." BOAA 2005-11 Pros. Sup. 120.

**Item 101. Summary of loans in Loan Group 1 about which the defendants made untrue or misleading statements:**

    **(a) Number of loans whose LTVs were materially understated as shown by the AVM:** 270

    **(b) Number of loans whose LTVs were misleading because of undisclosed additional liens:** 456

    **(c) Number of loans for which the properties were stated to be owner-occupied but were not:** 138

    **(d) Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 650

    **(e) Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 55.3%

## SCHEDULE 2 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants BAFC, BAS, and BOA.

**Item 38. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial**: BAS.

**(b) Description of the trust**: Banc of America Funding Trust, Mortgage Pass-Through Certificates, Series 2005-7 was a securitization in November 2005 of 2,143 mortgage loans, in four groups. BAFC was the issuer of the securities in the trust. Chase Home Finance LLC originated or acquired 100% of the loans in Group 2. BAFC 2005-7 Pros. Sup. S-29. No other originator originated or acquired more than 7% of the mortgage loans in any loan group. BAFC 2005-7 Pros. Sup. S-29.

**(c) Description of the certificate(s) that Colonial purchased**: BAS was the underwriter of the security that Colonial purchased. BAS offered and sold to Colonial a senior certificate in class 2-A-3 of this securitization, for which Colonial paid $26,087,775 plus accrued interest on January 10, 2006. Colonial's certificate was primarily paid by the 1,002 mortgage loans in Group 2.

**(d) Ratings of the certificate(s) when Colonial purchased them**: Fitch: AAA; Moody's: Aaa.

**(e) Current ratings of the certificate(s)**: Fitch: BB; Moody's: Ba3.

**(f) Date on which the certificate(s) were downgraded below investment grade**: April 30, 2010.

**(g) URL of prospectus supplement for this securitization**: http://sec.gov/Archives/edgar/data/802106/0000891092060 00269/e23306_424b5.txt

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by BAFC with the SEC on form S-3 on December 22, 2004. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, BAFC and BAS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) The original loan-to-value ratios of the mortgage loans in Group 2 as of the Cut-Off Date ranged from 14.93% to 90.00%. BAFC 2005-7 Pros. Sup. S-11.

(b) "As of the Cut-Off Date, no Mortgage Loan will have a Loan-to-Value Ratio of more than 100.00%." BAFC 2005-7 Pros. Sup. S-30.

(c) In the section of the prospectus supplement entitled "The Mortgage Pool," BAS and BAFC presented a table entitled "Original Loan-to-Value Ratios." This table divided the loans in Group 2 into 16 categories of original LTV (for example, 10.01% to 15.00%, 15.01% to 20.00%, 20.01% to 25.00%, etc.). The table contained untrue or misleading statements about the number of mortgage loans, the cut-off date principal balance outstanding, and the percent of cut-off date principal balance outstanding in each of these categories. BAFC 2005-7 Pros. Sup. S-37.

(d) "As of the Cut-off Date, the weighted average Loan-to-Value Ratio at origination of the Group 2 Mortgage Loans is expected to be approximately 72.58%." BAFC 2005-7 Pros. Sup. S-37.

**Item 56. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate (Group 2) | 1,002 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 210 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $7,621,829 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 168 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $12,541,582 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 45 |
| Weighted-average LTV, as stated by defendants | 72.58% |
| Weighted-average LTV, as determined by the model | 80.2% |

**Item 62. Undisclosed additional liens in Group 2:**

**(a) Minimum number of properties with additional liens:** 60

**(b) Weighted average CLTV with additional liens:** 72.7%

**Item 87. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On page S-52 of the prospectus supplement, BAFC and BAS made statements about the underwriting

standards of Chase Home Finance LLC. All of those statements are incorporated herein by reference.

One of these statements was that: "All of the Mortgage Loans originated or acquired by [Chase Home] were originated in a manner generally consistent with Fannie Mae or Freddie Mac published underwriting guidelines for mortgage loans where the related mortgaged properties are non-owner occupied. [Chase Home] believes that each Mortgage Loan originated in such a manner generally meets, subject to normal exceptions and/or variances, the credit, appraisal and underwriting standards described in such published underwriting guidelines." BAFC 2005-7 Pros. Sup. S-52.

Another one of these statements was that: "From time to time, exceptions and/or variances to CHF underwriting policies may be made. Such exceptions may be made only if specifically approved on a loan-by-loan basis by certain credit personnel of CHF who have the authority to make such exceptions and/or variances. Exceptions and/or variances may be made only after careful consideration of certain mitigating factors such as borrower capacity, liquidity, employment and residential stability and local economic conditions." BAFC 2005-7 Pros. Sup. S-52.

**Item 95. 90+ days delinquencies in Group 2:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 93

**SCHEDULE 2 OF THE COMPLAINT**            **Page 5**

    **(b)  Percent of the mortgage loans that suffered 90+ days delinquencies:** 9.3%

**Item 96.  30+ days delinquencies in Group 2:**

    **(a)  Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 95

    **(b)  Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 9.5%

**Item 98.  Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-5 through S-6 and S-138 of the prospectus supplement, BAS and BAFC made statements about the ratings assigned to the certificates issued in this securitization. BAFC and BAS stated that Colonial's certificate was rated AAA by Fitch Ratings and Aaa by Moody's. BAFC 2005-7 Pros. Sup. S-5. These were the highest ratings available from these two rating agencies.

BAFC and BAS also stated: "At their issuance, each class of Offered Certificates is required to receive from Fitch Ratings . . . and Moody's Investors Service, Inc. . . at least the rating set forth in the table beginning on page S-5 of this Prospectus Supplement." BAFC 2005-7 Pros. Sup. S-138.

**Item 101. Summary of loans in Group 2 about which the defendants made untrue or misleading statements:**

    **(a)  Number of loans whose LTVs were materially understated as shown by the AVM:** 210

**SCHEDULE 2 OF THE COMPLAINT**                              **Page 6**

    **(b) Number of loans whose LTVs were misleading because of undisclosed additional liens:** 60

    **(c) Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 251

    **(d) Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 25%

## SCHEDULE 3 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CMLTI, Citigroup, and Citigroup FP.

**Item 38. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial:** Citigroup.

**(b) Description of the trust:** Citigroup Mortgage Loan Trust Inc. Mortgage Pass-Through Certificates, Series 2006-AR6 was a securitization in August 2006 of 4,038 mortgage loans, in two groups. CMLTI was the issuer of the securities in the trust. Wells Fargo Bank, N.A. originated approximately 99.22% of the Group 1 loans. CMLTI 2006-AR6 Pros. Sup. S-112.

**(c) Description of the certificate(s) that Colonial purchased:** Citigroup was the underwriter of the security that Colonial purchased. Citigroup offered and sold to Colonial a senior certificate in this securitization, in class 1-A1, for which Colonial paid $25,054,700 plus accrued interest on September 25, 2006. Colonial's certificate was primarily paid by the 1,202 mortgage loans in Group 1.

**(d) Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Moody's: Aaa.

**(e) Current ratings of the certificate(s):** Fitch: C; Moody's: Caa2.

**(f) Date on which the certificate(s) were downgraded below investment grade:** February 4, 2009.

**(g) URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/1370972/000088237706 002994/d556075-prosupp.htm

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CMLTI with the SEC on form S-3 on January 19, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CMLTI and Citigroup made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) "The weighted average loan-to-value ratio at origination of the Group 1 Mortgage Loans was approximately 75.18%." CMLTI 2006-AR6 Pros. Sup. S-32.

(b) "No Group 1 Mortgage Loan had a loan-to-value ratio at origination greater than approximately 95.00% or less than approximately 23.73%." CMLTI 2006-AR6 Pros. Sup. S-32.

(c) In Annex II of the prospectus supplement ("Mortgage Loan Statistics") CMLTI and Citigroup presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original principal balances of $100,000.00 to $150,000.00, $150,001.00 to $175,000.00, $175,001.00 to $200,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original LTV." There were 29 such tables in the "Mortgage Loan Statistics" section for the loans in Group 1. In each table the number of categories into which the loans were divided ranged from 1 to 20. Thus, in "The Mortgage Loan Statistics" section, CMLTI and Citigroup made many untrue or misleading statements about the original LTVs of the loans in Group 1. CMLTI 2006-AR6 Pros. Sup. II-1 through II-9.

(d) "The weighted-average Original loan-to-value ratio of the [Group 1] mortgage loans as of the cut-off

date was approximately 75.18%." CMLTI 2006-AR6 Pros.
Sup. II-3.

(e) "The weighted-average Combined loan-to-value
ratio of the [Group 1] mortgage loans as of the cut-off
date was approximately 80.93%." CMLTI 2006-AR6 Pros.
Sup. II-3.

(f) "Mortgage Loans [originated by Wells Fargo
Bank, N.A.] will not generally have had at origination
a Loan-to-Value Ratio in excess of 95%." CMLTI 2006-AR6
Pros. Sup. S-50.

**Item 56. Details of the results of the AVM analysis for
the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (Group 1) | 1,202 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 402 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $70,450,159 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 142 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $11,694,315 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 97 |
| Weighted-average LTV, as stated by defendants | 75.18% |
| Weighted-average LTV, as determined by the model | 88.1% |

**SCHEDULE 3 OF THE COMPLAINT**                    **Page 4**

**Item 77.  Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CMLTI and Citigroup made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In Annex II of the prospectus supplement, described in Item 47, CMLTI and Citigroup presented a table entitled "Occupancy Status of the Group 1 Mortgage Loans." This table divided the mortgage loans into the categories "Primary," "Second Home," and "Investor." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the principal balance outstanding, and the percent of the principal balance at origination of the mortgage loans in each of these categories. CMLTI 2006-AR6 Pros. Sup. II-3.

(b) In the "Occupancy Status of the Group 1 Mortgage Loans" table, CMLTI and Citigroup stated that of the 1,202 mortgage loans in Group 1, 1,113 were secured by primary residences, and 89 were not. CMLTI 2006-AR6 Pros. Sup. II-3.

**Item 84.  Details of properties in Group 1 that were stated to be owner-occupied, but were not:**

**(a) Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 82

(b) **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 193

(c) **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 57

(d) **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 257

**Item 87. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-44 through S-52 of the prospectus supplement, CMLTI and Citigroup made statements about the underwriting standards of Wells Fargo Bank, N.A. All of those statements are incorporated herein by reference.

One of those statements was that: "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral." CMLTI 2006-AR6 Pros. Sup. S-47.

**Item 95. 90+ days delinquencies in Group 1:**

(a) **Number of the mortgage loans that suffered 90+ days delinquencies:** 243

(b) **Percent of the mortgage loans that suffered 90+ days delinquencies:** 20.2%

**Item 96.  30+ days delinquencies in Group 1:**

  **(a)  Number of the mortgage loans that were 30+ days delinquent on January 31, 2012**: 203

  **(b)  Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012**: 16.9%

**Item 98.  Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-13 and S-137 through S-138 of the prospectus supplement, CMLTI and Citigroup made statements about the ratings assigned to the certificates issued in this securitization. CMLTI and Citigroup stated that Colonial's certificate was rated AAA by Fitch Ratings and Aaa by Moody's. CMLTI 2006-AR6 Pros. Sup. S-13. These were the highest ratings available from these two rating agencies.

CMLTI and Citigroup also stated: "It is a condition of the issuance of the certificates that each class of the Offered Certificates be rated not lower than the initial rating indicated for such class in the table . . . [on page S-13 of the prospectus supplement]." CMLTI 2006-AR6 Pros. Sup. S-137.

**Item 101. Summary of loans in Group 1 about which the defendants made untrue or misleading statements:**

  **(a)  Number of loans whose LTVs were materially understated as shown by the AVM:** 402

  **(b)  Number of loans for which the properties were stated to be owner-occupied but were not:** 257

**(c)  Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 592

**(d)  Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 49.0%

## SCHEDULE 4 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CMSI, Credit Suisse, and CitiMortgage.

**Item 38. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial:** Credit Suisse.

**(b) Description of the trust:** Citicorp Mortgage Securities Trust, REMIC Pass-Through Certificates, Series 2005-8 was a securitization in November 2005 of 852 mortgage loans, in two pools. CMSI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by CitiMortgage, Citibank, FSB, or Citibank, N.A. CMSI 2005-8 Pros. Sup. 8.

**(c) Description of the certificate(s) that Colonial purchased:** Credit Suisse was the underwriter of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class 1-A-6, for which Colonial paid $16,668,517 plus accrued interest on January 30, 2006. Colonial's certificate was primarily paid by the 721 mortgage loans in Pool I.

**(d) Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Standard & Poor's: AAA; Moody's: Aaa.

**(e) Current ratings of the certificate(s):** Fitch: BB; Standard & Poor's: B; Moody's: B3.

**(f) Date on which the certificate(s) were downgraded below investment grade:** June 5, 2009.

**(g) URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/811785/000112528205006229/b409992_424b5.txt

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CMSI with the SEC on form S-3 on October 14, 2003. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CSMI and Credit Suisse made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) As of the cut-off date, the weighted average loan-to-value ratio at origination (taking into account the loanable value of additional collateral) of the

mortgage loans in Pool I was approximately 65.69%. CMSI 2005-8 Pros. Sup. 6.

(b) None of the mortgage loans at origination (taking into account the loanable value of additional collateral) in Pool I had a loan-to-value ratio over 95%. CMSI 2005-8 Pros. Sup. 6.

(c) In the Appendix to the prospectus supplement ("Detailed description of the mortgage loans"), CSMI and Credit Suisse presented a table entitled "Distribution by loan-to-value ratio at origination." This table divided the loans in Pool I into six categories of original LTV (for example, 65.00% and below, 65.001% to 75.000%, 75.001% to 80.000%, 80.001% to 85.000%, etc.). The table contained untrue or misleading statements about the number of mortgage loans and the aggregate principal balance in each of these categories. CMSI 2005-8 Pros. Sup. 26.

**Item 56. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate (Pool I) | 721 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 238 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $54,922,955 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 65 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $8,441,936 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 81 |
| Weighted-average LTV (taking into account the loanable value of additional collateral), as stated by defendants | 65.69% |
| Weighted-average LTV, as determined by the model | 82.0% |

**Item 62. Undisclosed additional liens in Pool I:**

**(a) Minimum number of properties with additional liens:** 177

**(b) Weighted average CLTV with additional liens:** 70.4%

**Item 77. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CSMI and Credit Suisse made the following statements about the occupancy status

of the properties that secured the mortgage loans in Pool I.

(a) Of the mortgage loans in Pool I, 95.77% of the properties related to those loans were determined by CMSI to be the primary residence of the borrower. CMSI 2005-8 Pros. Sup. 6.

**Item 84. Details of properties in Pool I that were stated to be owner-occupied, but were not:**

**(a) Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 65

**(b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 106

**(c) Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 49

**(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 186

**Item 87. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 68 through 71 of the prospectus, CMSI and Credit Suisse made statements about the underwriting guidelines of CMSI and its affiliates, including CitiMortgage, Citibank, FSB, and Citibank, N.A. CMSI 2005-8 Pros. 67-71. All of those statements are incorporated herein by reference.

**SCHEDULE 4 OF THE COMPLAINT**                                    **Page 5**

One of these statements was that the "originator decides . . . whether the prospective borrower has enough monthly income to meet monthly obligations on the proposed loan and related expenses as well as the prospective borrower's other financial obligations and monthly living expenses . . . ." CMSI 2005-8 Pros. 69.

Another one of these statements was that the "originator decides . . . whether the prospective borrower has enough liquid assets to acquire the mortgaged property and make the initial monthly mortgage payments . . . ." CMSI 2005-8 Pros. 69.

Another one of these statements was that the "originators require the value of the mortgaged property, together with any other collateral, to support the principal balance of the mortgage loan, with enough excess value to protect against minor declines in real estate values." CMSI 2005-8 Pros. 70.

**Item 95. 90+ days delinquencies in Pool I:**

    **(a)** **Number of the mortgage loans that suffered 90+ days delinquencies**: 57

    **(b)** **Percent of the mortgage loans that suffered 90+ days delinquencies**: 7.91%

**Item 96. 30+ days delinquencies in Pool I:**

    **(a)** **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012**: 42

    **(b)** **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012**: 5.83%

**SCHEDULE 4 OF THE COMPLAINT**                                    **Page 6**

**Item 98.  Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages 3 and 5 of the prospectus supplement, CSMI and Credit Suisse made statements about the ratings assigned to the certificates issued in this securitization. CSMI and Credit Suisse stated that Colonial's certificate was rated AAA by Fitch Ratings, AAA by Standard & Poor's, and Aaa by Moody's. These were the highest ratings available from these rating agencies.

CSMI and Credit Suisse also stated: "The offered certificates will not be sold unless the rating agencies have rated the offered certificates as shown above." CMSI 2005-8 Pros. Sup. 5.

**Item 101. Summary of loans in Pool I about which the defendants made untrue or misleading statements:**

  **(a)  Number of loans whose LTVs were materially understated as shown by the AVM:** 238

  **(b)  Number of loans whose LTVs were misleading because of undisclosed additional liens:** 177

  **(c)  Number of loans for which the properties were stated to be owner-occupied but were not:** 186

  **(d)  Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 443

  **(e)  Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 61.4%

## SCHEDULE 5 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CSMI, Citigroup, and CitiMortgage.

**Item 38. Details of trust and certificate(s).**

**(a)  Dealer that sold the certificate(s) to Colonial:** Citigroup.

**(b) Description of the trust:** Citicorp Mortgage Securities Trust, REMIC Pass-Through Certificates, Series 2006-4 was a securitization in August 2006 of 749 mortgage loans, in three pools. CMSI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by CitiMortgage, Citibank, FSB, or Citibank, N.A. CMSI 2006-4 Pros. Sup. 11.

**(c) Description of the certificate(s) that Colonial purchased:** Citigroup was the underwriter of the security that Colonial purchased. Citigroup offered and sold to Colonial a senior certificate in this securitization, in class 1-A-4, for which Colonial paid $14,214,591 plus accrued interest on October 12, 2006. Colonial's certificate was primarily paid by the 607 mortgage loans in Pool I.

**(d) Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Standard & Poor's: AAA; Moody's: Aaa.

**(e) Current ratings of the certificate(s):** Fitch: CCC; Standard & Poor's: B-; Moody's: Caa1.

**(f) Date on which the certificate(s) were downgraded below investment grade:** September 10, 2009.

**(g) URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/811785/000136153006000040/cmsi2006-4424b5.htm

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CMSI with the SEC on form S-3 on December 15, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CMSI and Citigroup made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) The weighted average loan-to-value ratio at origination (taking into account the loanable value of additional collateral) of the mortgage loans in Pool I was 68.98%. CMSI 2006-4 Pros. Sup. 8.

(b) None of the mortgage loans at origination (taking into account the loanable value of additional collateral) in Pool I had a loan-to-value ratio over 95%. CMSI 2005-8 Pros. Sup. 8.

(c) In the Appendix to the prospectus supplement ("Detailed description of the mortgage loans"), CMSI and Citigroup presented a table entitled "Distribution by loan-to-value ratio at origination." This table divided the loans in Pool I into six categories of original LTV (for example, 65.00% and below, 65.001% to 75.000%, 75.001% to 80.000%, 80.001% to 85.000%, etc.). The table contained untrue or misleading statements about the number of mortgage loans and the aggregate principal balance outstanding in each of these categories. CMSI 2006-4 Pros. Sup.39.

**Item 56.  Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (Pool I) | 607 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 205 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $44,091,290 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 44 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $5,060,738 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 59 |
| Weighted-average LTV (taking into account the loanable value of additional collateral), as stated by defendants | 68.98% |
| Weighted-average LTV, as determined by the model | 83.8% |

**Item 62.  Undisclosed additional liens in Pool I:**

> **(a)  Minimum number of properties with additional liens:** 147

> **(b)  Weighted average CLTV with additional liens:** 72.7%

**Item 77.  Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CMSI and Citigroup made the following statement about the occupancy status of the

properties that secured the mortgage loans in the collateral pool of this securitization.

(a) Of the mortgage loans in Pool I, 92.77% of the properties related to those loans were determined by CMSI to be the primary residence of the homeowner. CMSI 2006-4 Pros. Sup. 8.

**Item 84. Details of properties in Pool I that were stated to be owner-occupied, but were not:**

**(a) Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 59

**(b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 71

**(c) Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 36

**(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 141

**Item 87. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 88 through 93 of the prospectus, CMSI and Citigroup made statements about the underwriting guidelines of CMSI and its affiliates, including CitiMortgage, Citibank, FSB, and Citibank, N.A. CMSI 2006-4 Pros. 88-93. All of those statements are incorporated herein by reference.

**SCHEDULE 5 OF THE COMPLAINT**                                    **Page 5**

One of these statements was that the "originator decides . . . whether the prospective borrower has enough monthly income to meet monthly obligations on the proposed loan and related expenses as well as the prospective borrower's other financial obligations and monthly living expenses . . . ." CMSI 2006-4 Pros. 91.

Another one of these statements was that the "originator decides . . . whether the prospective borrower has enough liquid assets to acquire the mortgaged property and make the initial monthly mortgage payments . . . ." CMSI 2006-4 Pros. S-91.

Another one of these statements was that the "originators require the value of the mortgaged property, together with any other collateral, to support the principal balance of the mortgage loan, with enough excess value to protect against minor declines in real estate values." CMSI 2006-4 Pros. 92.

**Item 95. 90+ days delinquencies in Pool I:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 49

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 8.1%

**Item 96. 30+ days delinquencies in Pool I:**

    **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 30

    **(b) Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 4.9%

**Item 98. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages 3 and 6 of the prospectus supplement, CMSI and Citigroup made statements about the ratings assigned to the certificates issued in this securitization. CSMI and Citigroup stated that Colonial's certificate was rated AAA by Fitch Ratings, AAA by Standard & Poor's, and Aaa by Moody's. These were the highest ratings available from these rating agencies.

CMSI and Citigroup also stated: "The offered certificates will not be sold unless the rating agencies have rated the offered certificates as shown above." CMSI 2006-4 Pros. Sup. 6.

**Item 101. Summary of loans in loan Pool I about which the defendants made untrue or misleading statements:**

**(a) Number of loans whose LTVs were materially understated as shown by the AVM:** 205

**(b) Number of loans whose LTVs were misleading because of undisclosed additional liens:** 147

**(c) Number of loans for which the properties were stated to be owner-occupied but were not:** 141

**(d) Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 375

**(e) Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 61.8%

## SCHEDULE 6 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CMSI, Citigroup, BAS, and CitiMortgage.

**Item 38. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial:** Citigroup.

**(b) Description of the trust:** Citicorp Mortgage Securities Trust, REMIC Pass-Through Certificates, Series 2007-6 was a securitization in July 2007 of 756 mortgage loans, in three pools. CMSI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by CitiMortgage. CMSI 2007-6 Pros. Sup. 13. No other organization originated as much as 10% of the mortgage loans in any pool, except that ABN AMRO Mortgage Group, Inc. originated approximately 36.2% of the mortgage loans in Pool I. CMSI 2007-6 Pros. Sup. 13.

**(c) Description of the certificate(s) that Colonial purchased:** Citigroup and BAS were the underwriters of the security that Colonial purchased. Citigroup offered and sold to Colonial a senior certificate in this securitization, in class 1-A-4, for which Colonial paid $36,954,973 plus accrued interest on August 31, 2007.

Colonial's certificate was primarily paid by the 709 mortgage loans in Pool I.

**(d) Ratings of the certificate(s) when Colonial purchased them**: Fitch: AAA; Moody's: Aaa.

**(e) Current ratings of the certificate(s)**: Fitch: B; Moody's: B2.

**(f) Date on which the certificate(s) were downgraded below investment grade**: September 10, 2009.

**(g) URL of prospectus supplement for this securitization**: http://sec.gov/Archives/edgar/data/811785/000140102507000 035/cmsi2007-6424b5.htm

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CMSI with the SEC on form S-3 on December 15, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CMSI, Citigroup, and BAS made the following statements about the LTVs of the

mortgage loans in the collateral pool of this securitization.

(a) The weighted average loan-to-value ratio at origination (taking into account the loanable value of additional collateral) of the mortgage loans in Pool I was approximately 68.31%. CMSI 2007-6 Pros. Sup. 10.

(b) None of the mortgage loans at origination (taking into account the loanable value of additional collateral) in Pool I will have a loan-to-value ratio over 95%. CMSI 2007-6 Pros. Sup. 10.

(c) In the Appendix to the prospectus supplement ("Detailed description of the mortgage loans"), CMSI, Citigroup, and BAS presented a table entitled "Distribution by loan-to-value ratio at origination." This table divided the loans in Pool I into six categories of original LTV (for example, 65.00% and below, 65.001% to 75.000%, 75.001% to 80.000%, 80.001% to 85.000%, etc.). The table contained untrue or misleading statements about the number of mortgage loans and the aggregate principal balance outstanding in each of these categories. CMSI 2007-6 Pros. Sup. 37.

**Item 56. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (Pool I) | 709 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 250 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $55,379,364 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 46 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,145,609 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 87 |
| Weighted-average LTV (taking into account the loanable value of additional collateral), as stated by defendants | 68.31% |
| Weighted-average LTV, as determined by the model | 85.3% |

**Item 62. Undisclosed additional liens in Pool I:**

**(a) Minimum number of properties with additional liens:** 193

**(b) Weighted average CLTV with additional liens:** 72.3%

**Item 77. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CMSI, Citigroup, and BAS made the following statement about the occupancy

status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) Of the mortgage loans in Pool I, 96.03% of the properties related to those loans were determined by CMSI to be the primary residence of the homeowner. CMSI 2007-6 Pros. 9.

**Item 84. Details of properties in Pool I that were stated to be owner-occupied, but were not:**

**(a) Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 67

**(b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 105

**(c) Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 37

**(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 186

**Item 87. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 83 through 86 of the prospectus, CMSI, Citigroup, and BAS made statements about the underwriting guidelines of CMSI and its affiliates. CMSI 2007-6 Pros. 83-86. All of those statements are incorporated herein by reference.

One of these statements was that the "originator decides . . . whether the prospective borrower has enough monthly income to meet monthly obligations on the proposed loan and related expenses as well as the prospective borrower's other financial obligations and monthly living expenses . . . ." CMSI 2007-6 Pros. 84.

Another one of these statements was that the "originator decides . . . whether the prospective borrower has enough liquid assets to acquire the mortgaged property and make the initial monthly mortgage payments . . . ." CMSI 2007-6 Pros. 84.

Another one of these statements was that the "originators require the value of the mortgaged property, together with any other collateral, to support the principal balance of the mortgage loan, with enough excess value to protect against minor declines in real estate values." CMSI 2007-6 Pros. 85.

**Item 95. 90+ days delinquencies in Pool I:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 52

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 7.3%

**Item 96. 30+ days delinquencies in Pool I:**

    **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 31

    **(b) Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 4.4%

**Item 98. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages 3 and 6 of the prospectus supplement, CMSI, Citigroup, and BAS made statements about the ratings assigned to the certificates issued in this securitization. CMSI, Citigroup, and BAS stated that Colonial's certificate was rated AAA by Fitch Ratings and Aaa by Moody's. CMSI 2007-6 Pros. Sup. 3. These were the highest ratings available from these rating agencies.

CMSI, Citigroup, and BAS also stated: "The offered certificates will not be sold unless the rating agencies have rated the offered certificates as shown above." CMSI 2007-6 Pros. Sup. 6.

**Item 101. Summary of loans in Pool I about which the defendants made untrue or misleading statements:**

**(a) Number of loans whose LTVs were materially understated as shown by the AVM:** 250

**(b) Number of loans whose LTVs were misleading because of undisclosed additional liens:** 193

**(c) Number of loans for which the properties were stated to be owner-occupied but were not:** 186

**(d) Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 452

**(e) Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 63.8%

**SCHEDULE 6 OF THE COMPLAINT**                                    **Page 7**

## SCHEDULE 7 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CSFB Mortgage Securities, Credit Suisse, and Credit Suisse Management.

**Item 38. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial**: Credit Suisse.

**(b) Description of the trust**: CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-1 was a securitization in January 2005 of 3,026 mortgage loans, in five groups. CSFB Mortgage Securities was the issuer of the securities in the trust. Wells Fargo Bank, N.A. originated or acquired 24.54% of the group 1 mortgage loans. CSMC 2006-1 Pros. Sup. S-49. No other originator originated or acquired more than 10% of the group 1 mortgage loans. CSMC 2006-1 Pros. Sup. S-5, S-49.

**(c) Description of the certificate(s) that Colonial purchased**: Credit Suisse was the underwriter of the security that Colonial purchased. Credit Suisse offered and sold to Colonial a senior certificate in class 1-A-4 of this securitization, for which Colonial paid $30,525,313 plus accrued interest on January 31, 2006. Colonial's certificate was primarily paid by the 1,304 mortgage loans in loan group 1.

**(d) Ratings of the certificate(s) when Colonial purchased them**: Fitch: AAA; Standard & Poor's: AAA; Moody's: Aaa.

**(e) Current ratings of the certificate(s)**: Fitch: C; Standard & Poor's: CC; Moody's: Caa2.

**(f) Date on which the certificate(s) were downgraded below investment grade**: February 25, 2009.

**(g) URL of prospectus supplement for this securitization**: http://sec.gov/Archives/edgar/data/802106/0000891092060 00269/e23306_424b5.txt

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CSFB Mortgage Securities with the SEC on form S-3 on August 26, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CSFB Mortgage Securities and Credit Suisse made the following

statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)  In the section of the prospectus supplement entitled "Description of the Mortgage Pool," CSFB Mortgage Securities and Credit Suisse presented a table entitled "Group 1 Original LTV Ratios." This table divided the loans in group 1 into 19 categories of original LTV (for example, <=10.00%, 10.001% – 15.000%, 15.001% – 20.000%, 20.001% - 25.000%, etc.). The table contained untrue or misleading statements about the number of mortgage loans, the cut-off date principal balance outstanding, and the percent of cut-off date principal balance outstanding in each of these categories. CSMC 2006-1 Pros. Sup. S-32.

(b)  "The minimum original LTV ratio and the maximum original LTV ratio for the group 1 mortgage loans are 6.980% and 97.000%, respectively." CSMC 2006-1 Pros. Sup. S-32.

(c)  "The weighted average original LTV ratio for the group 1 mortgage loans is approximately 67.826%." CSMC 2006-1 Pros. Sup. S-32.

(d)  "Mortgage loans [originated by Wells Fargo] will not generally have had at origination a Loan-to-Value Ratio in excess of 95%." CSMC 2006-1 Pros. Sup. S-55.

**SCHEDULE 7 OF THE COMPLAINT**                    **Page 3**

**Item 56.  Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate (loan group 1) | 1,304 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 381 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $23,400,440 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 150 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $10,660,683 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 52 |
| Weighted-average LTV, as stated by defendants | 67.826% |
| Weighted-average LTV, as determined by the model | 75.0% |

**Item 62.  Undisclosed additional liens in loan group 1:**

  **(a)  Minimum number of properties with additional liens:** 271

  **(b)  Weighted average CLTV with additional liens:** 70.7%

**Item 71.  Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CSFB Mortgage Securities and Credit Suisse made the following statement about the appraisals of the properties that

**SCHEDULE 7 OF THE COMPLAINT**                    **Page 4**

secured the mortgage loans originated or acquired by the originators: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac." CSMC 2006-1 Pros. Sup. S-50.

**Item 77.  Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CSFB Mortgage Securities and Credit Suisse made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In the "Description of the Mortgage Pool" section of the prospectus supplement CSFB Mortgage Securities and Credit Suisse presented a table entitled "Group 1 Occupancy Types." This table divided the mortgage loans in group 1 into the categories "Primary," "Second Home," and "Investment." This table contained untrue or misleading statements about the number of mortgage loans, the cut-off date principal balance outstanding, and the percent of the cut-off date principal balance of the mortgage loans in group 1 in each of these categories. CSMC 2006-1 Pros. Sup. S-32.

(b)  In the "Occupancy Types" table, CSFB Mortgage Securities and Credit Suisse stated that of the 1,304 mortgage loans in loan group 1, 786 were secured by primary residences and 518 were not. CSMC 2006-1 Pros. Sup. S-32.

**Item 84.  Details of properties in loan group 1 that were stated to be owner-occupied, but were not:**

**(a)  Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 108

**(b)  Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 91

**(c)  Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 16

**(d)  Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 183

**Item 87.  Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-49 through S-59 of the prospectus supplement, CSFB Mortgage Securities and Credit Suisse made statements about the underwriting standards of the originators. All of those statements are incorporated herein by reference.

**SCHEDULE 7 OF THE COMPLAINT**                    **Page 6**

One of these statements was that: "[C]ertain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower." CSMC 2006-1 Pros. Sup. S-49.

Another one of these statements was that: "Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan . . . ." CSMC 2006-1 Pros. Sup. S-50.

Another one of these statements was that: "The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator." CSMC 2006-1 Pros. Sup. S-50.

On pages S-51 through S-59 of the prospectus supplement, CSFB Mortgage Securities and Credit Suisse made statements about the underwriting standards of Wells Fargo Bank, N.A. All of those statements are incorporated herein by reference.

One of those statements was that: "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo to evaluate the applicant's

credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral." CSMC 2006-1 Pros. Sup. S-53.

**Item 95. 90+ days delinquencies in loan group 1:**

> **(a)  Number of the mortgage loans that suffered 90+ days delinquencies:** 263

> **(b)  Percent of the mortgage loans that suffered 90+ days delinquencies:** 20.2%

**Item 96. 30+ days delinquencies in loan group 1:**

> **(a)  Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 232

> **(b)  Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 17.8%

**Item 98. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-7 through S-8 and S-148 of the prospectus supplement, CSFB Mortgage Securities and Credit Suisse made statements about the ratings assigned to the certificates issued in this securitization. CSFB Mortgage Securities and Credit Suisse stated that Colonial's certificate was rated AAA by Fitch Ratings, AAA by Standard & Poor's, and Aaa by Moody's. CSMC 2006-1 Pros. Sup. S-7. These were the highest ratings available from these rating agencies.

CSFB Mortgage Securities and Credit Suisse also stated: "It is a condition to the issuance of the offered certificates that they be rated as indicated on

pages S-7 and S-8 of this prospectus supplement by Standard & Poor's Ratings Services . . ., Moody's Investors Service, Inc. . . ., and Fitch Ratings . . . ." CSMC 2006-1 Pros. Sup. S-148.

**Item 101. Summary of loans in loan group 1 about which the defendants made untrue or misleading statements:**

    **(a)  Number of loans whose LTVs were materially understated as shown by the AVM:** 381

    **(b)  Number of loans whose LTVs were misleading because of undisclosed additional liens:** 271

    **(c)  Number of loans for which the properties were stated to be owner-occupied but were not:** 183

    **(d)  Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 642

    **(e)  Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 49.2%.

## SCHEDULE 8 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CSFB Mortgage Securities, Credit Suisse, and Credit Suisse Management.

**Item 38. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial:** Credit Suisse.

**(b) Description of the trust:** CSMC Mortgage-Backed Trust, Pass-Through Certificates, Series 2006-7 was a securitization in July 2006 of 3,217 mortgage loans, in four pools (further subdivided into 12 groups). CSFB Mortgage Securities was the issuer of the securities in the trust. DLJ Mortgage Capital, Inc. acquired approximately 41.20% of the mortgage loans in pools 2 through 4, Countrywide Home Loans, Inc. originated or acquired approximately 16.91% of the mortgage loans in pools 2 through 4, and Credit Suisse Financial Corporation originated approximately 13.46% of the mortgage loans in pools 2 through 4. No other originator originated or acquired more than 10% of the mortgage loans. CSMC 2006-7 Pros. Sup. S-5 through S-6, S-39.

**(c) Description of the certificate(s) that Colonial purchased:** Credit Suisse was the underwriter of the securities that Colonial purchased. Credit Suisse offered and sold to Colonial a senior certificate in this

securitization, in class 8-A-11, for which Colonial paid $16,986,760 plus accrued interest on October 10, 2006, and a senior certificate, in class 10-A-6, for which Colonial paid $21,584,063 plus accrued interest on October 11, 2006. Colonial's certificate in class 8-A-11 was primarily paid by 681 mortgage loans in group 8, one of four loan groups related to loan pool 2; Colonial's certificate in class 10-A-6 was primarily paid by 325 mortgage loans in group 10, one of two loan groups in loan pool 3. CSMC 2006-7 Pros. Sup. S-13.

**(d) Ratings of the certificate(s) when Colonial purchased them**: Class 8-A-11: Fitch: AAA; Standard & Poor's: AAA; Moody's: Aaa. Class 10-A-6: Fitch: AAA; Standard & Poor's: AAA; Moody's: Aaa.

**(e) Current ratings of the certificate(s)**: Class 8-A-11: Fitch: D; Standard & Poor's: D; Moody's: Caa3. Class 10-A-6: Fitch: D; Standard & Poor's: D; Moody's: Caa3.

**(f) Date on which the certificate(s) were downgraded below investment grade**: Class 8-A-11: October 30, 2008. Class 10-A-6: October 30, 2008.

**(g) URL of prospectus supplement for this securitization**: http://sec.gov/Archives/edgar/data/802106/000089109206002155/e24644_424b5.txt

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificates that Colonial purchased,

**SCHEDULE 8 OF THE COMPLAINT**                                    **Page 2**

were issued pursuant or traceable to a registration statement filed by CSFB Mortgage Securities with the SEC on form S-3 on January 6, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CSFB Mortgage Securities and Credit Suisse made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) In Annex II of the prospectus supplement ("Mortgage Loan Statistical Information"), CSFB Mortgage Securities and Credit Suisse presented tables entitled "Pool 2 Original LTV Ratios" and "Pool 3 Original LTV Ratios." The table for pool 2 divided the loans into 18 categories of original LTV (for example, 10.001% to 15.000%, 15.001% to 20.000%, 20.001% to 25.000%, etc.); the table for pool 3 divided the loans into 15 categories of original LTV (for example, 20.001% to 25.000%, 25.001% to 30.000%, 30.001% to 35.000%, etc.). CSMC 2006-7 Pros. Sup.

II-6, II-101.[1] The tables contained untrue or misleading statements about the number of mortgage loans, the cut-off date principal balance outstanding, and the percent of cut-off date principal balance outstanding in each of these categories for the loans in pool 2 and pool 3. CSMC 2006-7 Pros. Sup. II-6, II-10.

(b) "The minimum original LTV ratio and the maximum original LTV ratio for the pool 2 mortgage loans are 12.000% and 100.00%, respectively." CSMC 2006-7 Pros. Sup. II-6.

(c) "The weighted average original LTV ratio for the pool 2 mortgage loans is approximately 71.810%." CSMC 2006-7 Pros. Sup. II-6.

(d) "The minimum original LTV ratio and the maximum original LTV ratio for the pool 3 mortgage loans are 22.600% and 95.000%, respectively." CSMC 2006-7 Pros. Sup. II-10.

(e) "The weighted average original LTV ratio for the pool 3 mortgage loans is approximately 70.006%." CSMC 2006-7 Pros. Sup. II-10.

---

[1] Annex II of the prospectus supplement contains two sets of pages numbers beginning with "II-." The first such set of page numbers relate to the loan groups and the second set of such page numbers relate to the loan pools. All citations to Annex II herein relate to the loan pools.

**SCHEDULE 8 OF THE COMPLAINT**                    **Page 4**

**Item 56. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificates (pool 2) | 1,539 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 581 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $29,690,897 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 146 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $9,183,297 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 85 |
| Weighted-average LTV, as stated by defendants | 71.810% |
| Weighted-average LTV, as determined by the model | 79.8% |

**Item 56.  Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (pool 3) | 356 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 131 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $22,851,393 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 15 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $1,979,845 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 20 |
| Weighted-average LTV, as stated by defendants | 70.006% |
| Weighted-average LTV, as determined by the model | 83.8% |

**Item 62.  Undisclosed additional liens in pool 2:**

   **(a) Minimum number of properties with additional liens:** 527

   **(b) Weighted average CLTV with additional liens:** 76.6%

**Item 62.  Undisclosed additional liens in pool 3:**

   **(a) Minimum number of properties with additional liens:** 92

   **(b) Weighted average CLTV with additional liens:** 73.2%

**SCHEDULE 8 OF THE COMPLAINT**                                    **Page 6**

**Item 71. Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CSFB Mortgage Securities and Credit Suisse made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by the originators: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac." CSMC 2006-7 Pros. Sup. S-40.

**Item 77. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CSFB Mortgage Securities and Credit Suisse made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In Annex II of the prospectus supplement ("Mortgage Loan Statistical Information"), CSFB Mortgage Securities and Credit Suisse presented tables entitled "Pool 2 Occupancy Types" and "Pool 3 Occupancy Types." These tables divided the mortgage loans in pools 2 and 3 into the categories "Primary," "Second Home," and "Investment." These tables contained untrue or misleading statements about the number of mortgage loans, the cut-off date principal balance outstanding, and the percent of the

**SCHEDULE 8 OF THE COMPLAINT**                              **Page 7**

cut-off date principal balance of the mortgage loans in each of these categories for the loans in pool 2 and pool 3. CSMC 2006-7 Pros. Sup. II-6, II-10.

(b) In the "Pool 2 Occupancy Types" table, CSFB Mortgage Securities and Credit Suisse stated that of the 1,539 mortgage loans in pool 2, 1,298 were secured by primary residences and 241 were not. CSMC 2006-7 Pros. Sup. II-6.

(c) In the "Pool 3 Occupancy Types" table, CSFB Mortgage Securities and Credit Suisse stated that of the 356 mortgage loans in pool 3, 324 were secured by primary residences and 32 were not. CSMC 2006-7 Pros. Sup. II-10.

**Item 84. Details of properties in pool 2 that were stated to be owner-occupied, but were not:**

    **(a) Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 119

    **(b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 131

    **(c) Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 77

    **(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 265

**Item 84.  Details of properties in pool 3 that were stated to be owner-occupied, but were not:**

**(a)  Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 46

**(b)  Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 76

**(c)  Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 32

**(d)  Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 119

**Item 87.  Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-39 through S-40 of the prospectus supplement, CSFB Mortgage Securities and Credit Suisse made statements about the underwriting standards of the originators. All of those statements are incorporated herein by reference.

One of these statements was that: "[C]ertain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower." CSMC 2006-7 Pros. Sup. S-39.

Another one of these statements was that: "Based on the data provided in the application and certain verification (if required), a determination is made by the original

lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan . . . ." CSMC 2006-7 Pros. Sup. S-40.

Another one of these statements was that: "The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator." CSMC 2006-7 Pros. Sup. S-40.

**Item 94. Early payment defaults in pool 2:**

    **(a) Number of the mortgage loans that suffered EPDs:** 12

    **(b) Percent of the mortgage loans that suffered EPDs:** 0.78%

**Item 95. 90+ days delinquencies in pool 2:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 586

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 38.1%

**Item 95. 90+ days delinquencies in pool 3:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 173

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 48.6%

**Item 96.  30+ days delinquencies in pool 2:**

    **(a)  Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 505

    **(b)  Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 32.8%

**Item 96.  30+ days delinquencies in pool 3:**

    **(a)  Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 138

    **(b)  Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 38.8%

**Item 98.  Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-7 through S-8, S-21 and S-141 of the prospectus supplement, CSFB Mortgage Securities and Credit Suisse made statements about the ratings assigned to the certificates issued in this securitization. CSFB Mortgage Securities and Credit Suisse stated that Colonial's certificate was rated AAA by Fitch Ratings, AAA by Standard & Poor's, and Aaa by Moody's. CSMC 2006-7 Pros. Sup. S-7. These were the highest ratings available from these rating agencies.

CSFB Mortgage Securities and Credit Suisse also stated: "When issued, the offered certificates will receive ratings that are not lower than those listed in the table beginning on page S-7 of this prospectus supplement." CSMC 2006-7 Pros. Sup. S-21.

CSFB Mortgage Securities and Credit Suisse also stated: "It is a condition to the issuance of the offered

certificates that they be rated as indicated on pages S-7 and S-8 of this prospectus supplement by Standard & Poor's Ratings Services . . ., Moody's Investors Service, Inc. . . , and Fitch Ratings . . . ." CSMC 2006-7 Pros. Sup. S-141.

**Item 101. Summary of loans in pool 2 about which the defendants made untrue or misleading statements:**

    **(a)  Number of loans whose LTVs were materially understated as shown by the AVM:** 581

    **(b)  Number of loans whose LTVs were misleading because of undisclosed additional liens:** 527

    **(c)  Number of loans for which the properties were stated to be owner-occupied but were not:** 265

    **(d)  Number of loans that suffered EPDs:** 12

    **(e)  Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 1,004

    **(f)  Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 65.2%

**Item 101. Summary of loans in pool 3 about which the defendants made untrue or misleading statements:**

    **(a)  Number of loans whose LTVs were materially understated as shown by the AVM:** 131

    **(b)  Number of loans whose LTVs were misleading because of undisclosed additional liens:** 92

    **(c)  Number of loans for which the properties were stated to be owner-occupied but were not:** 119

    **(d)  Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 241

**(e) Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 67.7%

## SCHEDULE 9 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CSFB Mortgage Securities, Credit Suisse, and Credit Suisse Management.

**Item 38. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial:** Credit Suisse.

**(b) Description of the trust:** CSMC Mortgage-Backed Trust, Pass-Through Certificates, Series 2007-2 was a securitization in February 2007 of 2,216 mortgage loans, in three groups. CSFB Mortgage Securities was the issuer of the securities in the trust. Countrywide Home Loans, Inc. originated or acquired approximately 54.95% of the group 1 loans. No other originator originated or acquired more than 10% of the mortgage loans. CSMC 2007-2 Pros. Sup. S-5, S-33.

**(c) Description of the certificate(s) that Colonial purchased:** Credit Suisse was the underwriter of the security that Colonial purchased. Credit Suisse offered and sold to Colonial a senior certificate in class 1-A-4 of this securitization, for which Colonial paid $52,880,950 plus accrued interest on March 20, 2007. Colonial's certificate was primarily paid by the 1,151 mortgage loans in loan group 1.

**(d) Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Standard & Poor's: AAA; Moody's: Aaa.

**(e) Current ratings of the certificate(s):** Fitch: C; Standard & Poor's: CC; Moody's: Caa2.

**(f) Date on which the certificate(s) were downgraded below investment grade:** March 24, 2009.

**(g) URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/802106/000089109207000715/e26478_424b5.txt

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CSFB Mortgage Securities with the SEC on form S-3 on June 30, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CSFB Mortgage Securities and Credit Suisse made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

**SCHEDULE 9 OF THE COMPLAINT**                    **Page 2**

(a) In Annex II of the prospectus supplement ("Mortgage Loan Statistical Information"), CSFB Mortgage Securities and Credit Suisse presented a table entitled "Group 1 Original LTV Ratios." This table divided the loans in group 1 into 15 categories of original LTV (for example, 20.001% to 25.000%, 25.001% to 30.000%, 30.001% to 35.000%, etc.). The table contained untrue or misleading statements about the number of mortgage loans, the cut-off date principal balance outstanding, and the percent of cut-off date principal balance outstanding in each of these categories. CSMC 2007-2 Pros. Sup. II-2.

(b) "The minimum original LTV ratio and the maximum original LTV ratio for the group 1 mortgage loans are 21.320% and 95.000%, respectively." CSMC 2007-2 Pros. Sup. II-2.

(c) "The weighted average original LTV ratio for the group 1 mortgage loans is approximately 70.423%." CSMC 2007-2 Pros. Sup. II-2.

**Item 56.  Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (loan group 1) | 1,151 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 264 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $36,906,654 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 160 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $20,824,199 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 43 |
| Weighted-average LTV, as stated by defendants | 70.423% |
| Weighted-average LTV, as determined by the model | 76.0% |

**Item 62.  Undisclosed additional liens in loan group 1:**

   **(a)  Minimum number of properties with additional liens:** 487

   **(b)  Weighted average CLTV with additional liens:** 76.2%

**Item 71.  Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CSFB Mortgage Securities and Credit Suisse made the following statement about the appraisals of the properties that secured the

**SCHEDULE 9 OF THE COMPLAINT**                    **Page 4**

mortgage loans originated or acquired by the originators: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac." CSMC 2007-2 Pros. Sup. S-34.

**Item 77. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CSFB Mortgage Securities and Credit Suisse made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In Annex II of the prospectus supplement, ("Mortgage Loan Statistical Information"), CSFB Mortgage Securities and Credit Suisse presented a table entitled "Group 1 Occupancy Types." This table divided the mortgage loans in group 1 into the categories "Primary," "Second Home," and "Investment." This table contained untrue or misleading statements about the number of mortgage loans, the cut-off date principal balance outstanding, and the percent of the cut-off date principal balance in each of these categories for the loans in group 1. CSMC 2007-2 Pros. Sup. II-2.

(b) In the "Group 1 Occupancy Types" table, CSFB Mortgage Securities and Credit Suisse stated that of the

1,151 mortgage loans in loan group 1, 1,051 were secured by primary residences and 100 were not. CSMC 2007-2 Pros. Sup. II-2.

**Item 84.  Details of properties in loan group 1 that were stated to be owner-occupied, but were not:**

    **(a)  Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 59

    **(b)  Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 160

    **(c)  Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 51

    **(d)  Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 221

**Item 87.  Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-33 through S-40 of the prospectus supplement, CSFB Mortgage Securities and Credit Suisse made statements about the underwriting standards of the originators. All of those statements are incorporated herein by reference.

One of these statements was that: "[C]ertain exceptions to the underwriting standards described herein are made in the event that compensating factors are

demonstrated by a prospective borrower." CSMC 2007-2
Pros. Sup. S-33.

Another one of these statements was that: "Based on
the data provided in the application and certain
verification (if required), a determination is made by
the original lender that the mortgagor's monthly income
(if required to be stated) will be sufficient to enable
the mortgagor to meet its monthly obligations on the
mortgage loan . . . ." CSMC 2007-2 Pros. Sup. S-34.

Another one of these statements was that: "The
adequacy of the mortgaged property as security for
repayment of the related mortgage loan will generally
have been determined by an appraisal in accordance with
pre-established appraisal procedure guidelines for
appraisals established by or acceptable to the
originator." CSMC 2007-2 Pros. Sup. S-34.

**Item 95. 90+ days delinquencies in loan group 1:**

    **(a) Number of the mortgage loans that suffered 90+
days delinquencies:** 66

    **(b) Percent of the mortgage loans that suffered 90+
days delinquencies:** 5.7 %

**Item 96. 30+ days delinquencies in loan group 1:**

    **(a) Number of the mortgage loans that were 30+ days
delinquent on January 31, 2012:** 53

    **(b) Percent of the mortgage loans that were 30+ days
delinquent on January 31, 2012:** 4.6%

**Item 98. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-7 through S-8 and S-120 through S-121 of the prospectus supplement, CSFB Mortgage Securities and Credit Suisse made statements about the ratings assigned to the certificates issued in this securitization. CSFB Mortgage Securities and Credit Suisse stated that Colonial's certificate was rated AAA by Fitch Ratings, AAA by Standard & Poor's, and Aaa by Moody's. CSMC 2007-2 Pros. Sup. S-7. These were the highest ratings available from these rating agencies.

CSFB Mortgage Securities and Credit Suisse also stated: "When issued, the offered certificates will receive ratings that are not lower than those listed in the table beginning on page S-7 of this prospectus supplement." CSMC 2007-2 Pros. Sup. S-18.

CSFB Mortgage Securities and Credit Suisse also stated: "It is a condition to the issuance of the offered certificates that they be rated as indicated on pages S-8 and S-9 of this prospectus supplement by Standard & Poor's Ratings Services . . ., Moody's Investors Service, Inc. . . , and Fitch Ratings . . . ." CSMC 2007-2 Pros. Sup. S-120.

**Item 101. Summary of loans in loan group 1 about which the defendants made untrue or misleading statements:**

**(a) Number of loans whose LTVs were materially understated as shown by the AVM:** 264

(b)  **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 487

(c)  **Number of loans for which the properties were stated to be owner-occupied but were not:** 221

(d)  **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 735

(e)  **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 63.9%

## SCHEDULE 10 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants FHASI, HSBC, FTN, and FHHLC.

**Item 38. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial:** HSBC

**(b) Description of the trust:** Alternative Mortgage Securities Trust, Mortgage Pass-Through Certificates, Series 2006-FA6 was a securitization in September 2006 of 2,345 mortgage loans, in three pools. FHASI was the issuer of the securities in the trust. The mortgage loans in the collateral pools of this securitization were originated or purchased by FHHLC. FHAMS 2006-FA6 Pros. Sup. S-7 through S-8.

**(c) Description of the certificate(s) that Colonial purchased:** HSBC and FTN were the underwriters of the securities that Colonial purchased. HSBC offered and sold to Colonial a senior certificate in this securitization, in class 1-A-2, for which Colonial paid $11,306,879 plus accrued interest on December 26, 2006, and a senior certificate, in class 2-A-3, for which Colonial paid $15,506,394 plus accrued interest on December 26, 2006. The class 1-A-2 certificate was primarily paid by the 647 mortgage loans in Pool I and

the class 2-A-3 certificate was primarily paid by the 1,505 mortgage loans in Pool II.

**(d) Ratings of the certificate(s) when Colonial purchased them**: Class 1-A-2: Fitch: AAA; Standard & Poor's: AAA. Class 2-A-3: Fitch: AAA; Standard & Poor's: AAA.

**(e) Current ratings of the certificate(s)**: Class 1-A-2: Fitch: C; Standard & Poor's: CCC. Class 2-A-3: Fitch: D; Standard & Poor's: D.

**(f) Date on which the certificate(s) were downgraded below investment grade**: Class 1-A-2: August 6, 2009. Class 2-A-3: August 6, 2009.

**(g) URL of prospectus supplement for this securitization**: http://sec.gov/Archives/edgar/data/1374266/000095011706 004072/a42832.htm

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificates that Colonial purchased, were issued pursuant or traceable to a registration statement filed by FHASI with the SEC on form S-3 on February 24, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**SCHEDULE 10 OF THE COMPLAINT**                    **Page 2**

**Item 47.  Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, FHASI, HSBC, and FTN made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)  The weighted average original loan-to-value ratio of the loans in Pool I was 70.29%. FHAMS 2006-FA6 Pros. Sup. S-9.

(b)  The weighted average original loan-to-value ratio of the loans in Pool II was 70.49%. FHAMS 2006-FA6 Pros. Sup. S-9.

(c)  The original loan-to-value ratios of the loans in Pool I ranged from 13.87% to 95.00%. FHAMS 2006-FA6 Pros. Sup. S-9.

(d)  The original loan-to-value ratios of the loans in Pool II ranged from 10.71% to 95.00%. FHAMS 2006-FA6 Pros. Sup. S-9.

(e)  "No mortgage loan has a loan-to-value ratio at origination of more than 95%." FHAMS 2006-FA6 Pros. Sup. S-33.

(f)  In Annex I of the prospectus supplement, FHASI, HSBC, and FTN presented a table entitled "Original Loan-to-Value Ratios for the Mortgage Loans in Pool I." This table divided the loans in Pool I into 10 categories of original LTV (for example, loans with an original loan-to-value ratio range of 50.00% and

below, 50.01% to 55.00%, 55.01% to 60.00%, etc.). This table contained untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percentage of the mortgage pool in each of these categories for the loans in Pool I. FHAMS 2006-FA6 Pros. Sup. I-1.

(g)   The weighted average original loan-to-value ratio of the mortgage loans in Pool I is expected to be approximately 70.29%." FHAMS 2006-FA6 Pros. Sup. I-1.

(h)   In Annex II of the prospectus supplement, FHASI, HSBC, and FTN presented a table entitled "Original Loan-to-Value Ratios for the Mortgage Loans in Pool II." This table divided the loans in Pool II into 10 categories of original LTV (for example, loans with an original loan-to-value ratio range of 50.00% and below, 50.01% to 55.00%, 55.01% to 60.00%, etc.). This table contained untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percentage of the mortgage pool in each of these categories for the loans in Pool II. FHAMS 2006-FA6 Pros. Sup. II-1.

(i)   "The weighted average original loan-to-value ratio of the mortgage loans in Pool II is expected to be approximately 70.49%." FHAMS 2006-FA6 Pros. Sup. II-1.

**Item 56. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate (Pool I) | 647 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 149 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $12,163,019 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 44 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $2,959,438 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 39 |
| Weighted-average LTV for loans, as stated by defendants | 70.29% |
| Weighted-average LTV for loans, as determined by the model | 80.9% |

**Item 56. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate (Pool II) | 1,505 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 376 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $22,215,314 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 132 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,031,015 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 87 |
| Weighted-average LTV for loans, as stated by defendants | 70.49% |
| Weighted-average LTV for loans, as determined by the model | 79.8% |

**Item 62. Undisclosed additional liens in Pool I:**

    **(a) Minimum number of properties with additional liens:** 207

    **(b) Weighted average CLTV with additional liens:** 75.1%

**Item 62. Undisclosed additional liens in Pool II:**

    **(a) Minimum number of properties with additional liens:** 478

    **(b) Weighted average CLTV with additional liens:** 74.8%

**Item 71. Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, FHASI, HSBC, and FTN made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by FHHLC: "All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Qualifications Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and/or Freddie Mac." FHAMS 2006-FA6 Pros. Sup. S-36.

**Item 77. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, FHASI, HSBC, and FTN made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In Annex I of the prospectus supplement, FHASI, HSBC, and FTN presented a table entitled "Occupancy Types for the Mortgage Loans in Pool I." This table divided the mortgage loans in Pool I into the categories "Primary Residence," "Investor Property," and "Secondary Residence." This table contained untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percentage of the mortgage

pool in each of these categories for the loans in Pool I. FHAMS 2006-FA6 Pros. Sup. I-2.

(b) In the "Occupancy Types for the Mortgage Loans in Pool I" table in Annex I, FHASI, HSBC, and FTN stated that of the 647 mortgage loans in Pool I, 427 were secured by primary residences and 220 were not. FHAMS 2006-FA6 Pros. Sup. I-2.

(c) In Annex II of the prospectus supplement, FHASI, HSBC, and FTN presented another table entitled "Occupancy Types for the Mortgage Loans in Pool II." This table divided the mortgage loans in Pool II into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, the number of mortgage loans, the aggregate principal balance outstanding, and the percentage of the mortgage pool in each of these categories for the loans in Pool II. FHAMS 2006-FA6 Pros. Sup. II-2.

(d) In the "Occupancy Types for the Mortgage Loans in Pool II" table in Annex II, FHASI, HSBC, and FTN stated that of the 1,505 mortgage loans in Pool II, 992 were secured by primary residences and 513 were not. FHAMS 2006-FA6 Pros. Sup. II-2.

**Item 84. Details of properties in Pool I that were stated to be owner-occupied, but were not:**

    **(a) Number of loans for which the owner of the property instructed tax authorities to send**

property tax bills to him or her at a different address: 58

(b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 78

(c) Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 27

(d) Eliminating duplicates, number of loans in Pool I about which one or more of statements (a) through (c) is true: 128

Item 84. Details of properties in Pool II that were stated to be owner-occupied, but were not:

(a) Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 90

(b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 158

(c) Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 68

(d) Eliminating duplicates, number of loans in Pool II about which one or more of statements (a) through (c) is true: 252

Item 87. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:

On pages S-34 through S-36 of the prospectus supplement, FHASI, HSBC, and FTN made statements about

**SCHEDULE 10 OF THE COMPLAINT**                    **Page 9**

the underwriting guidelines of FHHLC. All of those statements are incorporated herein by reference.

One of these statements was that: "The First Horizon Underwriting Guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." FHAMS 2006-FA6 Pros. Sup. S-35.

Another one of these statements was that: "Exceptions to the First Horizon Underwriting Guidelines are permitted where compensating factors are present." FHAMS 2006-FA6 Pros. Sup. S-35.

**Item 95. 90+ days delinquencies in Pool I:**

   **(a)  Number of the mortgage loans that suffered 90+ days delinquencies:** 170

   **(b)  Percent of the mortgage loans that suffered 90+ days delinquencies:** 26.3%

**Item 95. 90+ days delinquencies in Pool II:**

   **(a)  Number of the mortgage loans that suffered 90+ days delinquencies:** 354

   **(b)  Percent of the mortgage loans that suffered 90+ days delinquencies:** 23.5%

**Item 96. 30+ days delinquencies in Pool I:**

   **(a)  Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 155

   **(b)  Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 24.0%

**Item 96. 30+ days delinquencies in Pool II:**

   **(a)  Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 311

**SCHEDULE 10 OF THE COMPLAINT**                              **Page 10**

**(b)   Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 20.7%

**Item 98. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-5 through S-6, S-14 through S-15 and S-92 of the prospectus supplement, FHASI, HSBC, and FTN made statements about the ratings assigned to the certificates issued in this securitization. FHASI, HSBC, and FTN stated that Colonial's certificates were rated AAA by Standard & Poor's and AAA by Fitch. FHAMS 2006-FA6 Pros. Sup. S-5. These were the highest ratings available from these rating agencies.

FHASI, HSBC, and FTN also stated: "The issuance of the offered certificates is conditioned on the certificates receiving the ratings from S&P, Fitch and Moody's indicated under the heading 'Expected Ratings' in the chart shown on page S-5 of this prospectus supplement." FHAMS 2006-FA6 Pros. Sup. S-14, S-92.

**Item 101.  Summary of loans in Pool I about which the defendants made untrue or misleading statements:**

**(a)   Number of loans whose LTVs were materially understated as shown by the AVM:** 149

**(b)   Number of loans whose LTVs were misleading because of undisclosed additional liens:** 207

**(c)   Number of loans for which the properties were stated to be owner-occupied but were not:** 128

**(d)   Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 369

    **(e) Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 57.0%

**Item 101. Summary of loans in Pool II about which the defendants made untrue or misleading statements:**

    **(a) Number of loans in Pool II whose LTVs were materially understated as shown by the AVM:** 376

    **(b) Number of loans whose LTVs were misleading because of undisclosed additional liens:** 478

    **(c) Number of loans for which the properties were stated to be owner-occupied but were not:** 252

    **(d) Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 869

    **(e) Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 57.7%.

## SCHEDULE 11 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants FHASI, Citigroup, BAS, FTN, and FHHLC.

**Item 38. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial:** Citigroup.

**(b) Description of the trust:** Alternative Mortgage Securities Trust, Mortgage Pass-Through Certificates, Series 2006-FA7 was a securitization in October 2006 of 862 mortgage loans in one pool. FHASI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or purchased by FHHLC. FHAMS 2006-FA7 Pros. Sup. S-6 through S-7.

**(c) Description of the certificate(s) that Colonial purchased:** Citigroup, BAS and FTN were the underwriters of the security that Colonial purchased. Citigroup offered and sold to Colonial a senior certificate in this securitization, in class A-4, for which Colonial paid $21,092,898 plus accrued interest on December 28, 2006.

**(d) Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Standard & Poor's: AAA.

**(e) Current ratings of the certificate(s):** Fitch: D; Standard & Poor's: D.

**(f) Date on which the certificate(s) were downgraded below investment grade:** December 17, 2008.

**(g) URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/1377419/000095011706 004368/a44879.htm

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by FHASI with the SEC on form S-3 on February 24, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, FHASI, Citigroup, BAS, and FTN made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) The weighted average original loan-to-value ratio of the loans was 68.46%. FHAMS 2006-FA7 Pros. Sup. S-7.

**SCHEDULE 11 OF THE COMPLAINT**                    **Page 2**

(b) The original loan-to-value ratios of the mortgage loans ranged from 8.89% to 95.00%. FHAMS 2006-FA7 Pros. Sup. S-7.

(c) "No mortgage loan has a loan-to-value ratio at origination of more than 95%." FHAMS 2006-FA7 Pros. Sup. S-27.

(d) In Annex I of the prospectus supplement, FHASI, Citigroup, BAS, and FTN presented a table entitled "Original Loan-to-Value Ratios for the Mortgage Loans." This table divided the loans in the collateral pool into 10 categories of original LTV (for example, loans with an original loan-to-value ratio range of 50.00% and below, 50.01% to 55.00%, 55.01% to 60.00%, etc.). This table contained untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percentage of the mortgage pool in each of these categories. FHAMS 2006-FA7 Pros. Sup. I-1.

(e) "The weighted average original loan-to-value ratio of the mortgage loans is expected to be approximately 68.46%." FHAMS 2006-FA7 Pros. Sup. I-1.

**Item 56. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 862 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 256 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $17,977,426 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 67 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,280,006 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 47 |
| Weighted-average LTV for loans, as stated by defendants | 68.46% |
| Weighted-average LTV for loans, as determined by the model | 79.5% |

**Item 62. Undisclosed additional liens:**

  **(a) Minimum number of properties with additional liens:** 254

  **(b) Weighted average CLTV with additional liens:** 73.0%

**Item 71. Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, FHASI, Citigroup, BAS, and FTN made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by FHHLC: "All appraisals

are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Qualifications Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and/or Freddie Mac." FHAMS 2006-FA7 Pros. Sup. S-30.

**Item 77. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, FHASI, Citigroup, BAS, and FTN made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In Annex I of the prospectus supplement, FHASI, Citigroup, BAS, and FTN presented a table entitled "Occupancy Types for the Mortgage Loans." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Investor Property," and "Secondary Residence." This table contained untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percentage of the mortgage pool in each of these categories. FHAMS 2006-FA7 Pros. Sup. I-2.

(b) In the "Occupancy Types for the Mortgage Loans" table in Annex I, FHASI, Citigroup, BAS, and FTN

stated that of the 862 mortgage loans in the collateral
pool, 564 were secured by primary residences and 298
were not. FHAMS 2006-FA7 Pros. Sup. I-2.

**Item 84.  Details of properties that were stated to be
          owner-occupied, but were not:**

> **(a)  Number of loans for which the owner of the
>       property instructed tax authorities to send
>       property tax bills to him or her at a
>       different address:** 73

> **(b)  Number of loans for which the owner of the
>       property could have, but did not, designate
>       the property as his or her homestead:** 88

> **(c)  Number of loans for which the owner of the
>       property did not receive bills at the address
>       of the mortgaged property but did receive
>       bills at a different address:** 26

> **(d)  Eliminating duplicates, number of loans about
>       which one or more of statements (a) through
>       (c) is true:** 159

**Item 87.  Untrue or misleading statements about the
          underwriting standards of the originators of
          the mortgage loans:**

On pages S-28 through S-30 of the prospectus
supplement, FHASI, Citigroup, BAS, and FTN made
statements about the underwriting guidelines of FHHLC.
All of those statements are incorporated herein by
reference.

One of these statements was that: "The First
Horizon Underwriting Guidelines are applied to evaluate
the prospective borrower's credit standing and
repayment ability and the value and adequacy of the

**SCHEDULE 11 OF THE COMPLAINT**                    **Page 6**

mortgaged property as collateral." FHAMS 2006-FA7 Pros. Sup. S-28.

Another one of these statements was that: "Exceptions to the First Horizon Underwriting Guidelines are permitted where compensating factors are present." FHAMS 2006-FA7 Pros. Sup. S-28.

**Item 95. 90+ days delinquencies:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 224

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 26.0%

**Item 96. 30+ days delinquencies:**

    **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 204

    **(b) Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 23.7%

**Item 98. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-5, S-11 and S-71 of the prospectus supplement, FHASI, Citigroup, BAS, and FTN made statements about the ratings assigned to the certificates issued in this securitization. FHASI, Citigroup, HSBC, and FTN stated that Colonial's certificate was rated AAA by Standard & Poor's and AAA by Fitch. FHAMS 2006-FA7 Pros. Sup. S-5. These were the highest ratings available from these rating agencies.

FHASI, Citigroup, BAS, and FTN also stated: "The issuance of the offered certificates is conditioned on the certificates receiving the ratings from Fitch and S&P indicated under the heading 'Expected Ratings' in the chart shown on page S-5 of this prospectus supplement." FHAMS 2006-FA7 Pros. Sup. S-11, S-71.

**Item 101. Summary of loans about which the defendants made untrue or misleading statements:**

    **(a) Number of loans whose LTVs were materially understated as shown by the AVM:** 256

    **(b) Number of loans whose LTVs were misleading because of undisclosed additional liens:** 254

    **(c) Number of loans for which the properties were stated to be owner-occupied but were not:** 159

    **(d) Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 500

    **(e) Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 58.0%

## SCHEDULE 12 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants FHASI, Credit Suisse, BAS, FTN, and FHHLC.

**Item 38. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial:** Credit Suisse.

**(b) Description of the trust:** Alternative Mortgage Securities Trust, Mortgage Pass-Through Certificates, Series 2007-FA4 was a securitization in June 2007 of 1,628 mortgage loans, in two pools. FHASI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or purchased by FHHLC. FHAMS 2007-FA4 Pros. Sup. S-6 through S-7.

**(c) Description of the certificate(s) that Colonial purchased:** Credit Suisse, BAS, and FTN were the underwriters of the security that Colonial purchased. Credit Suisse offered and sold to Colonial a senior certificate in this securitization, in class 1-A-4, for which Colonial paid $14,351,686 plus accrued interest on July 17, 2007. Colonial's certificate was primarily paid by the 1,557 mortgage loans in Pool I.

**(d) Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Moody's: Aaa; Standard & Poor's: AAA.

SCHEDULE 12 OF THE COMPLAINT                                    Page 1

**(e) Current ratings of the certificate(s):** Fitch: D; Moody's: Caa3; Standard & Poor's: D.

**(f) Date on which the certificate(s) were downgraded below investment grade:** December 16, 2008.

**(g) URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/1400736/000093041307005662/c49226_424b5.htm

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by FHASI with the SEC on form S-3 on May 16, 2007. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47. Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, FHASI, Credit Suisse, BAS, and FTN made the following statements about the LTVs of the mortgage loans in Pool I of this securitization.

(a) The weighted average original loan-to-value ratio of the loans in Pool I was 72.59%. FHAMS 2007-FA4 Pros. Sup. S-8.

**SCHEDULE 12 OF THE COMPLAINT**                              **Page 2**

(b)   The  original  loan-to-value  ratios  of  the  mortgage loans  in  Pool  I  ranged  from  5.88%  to  100.00%.  FHAMS  2007-FA4 Pros. Sup. S-8.

(c)   "No  mortgage  loan  has  a  loan-to-value  ratio  at origination  of  more  than  100%."  FHAMS  2007-FA4  Pros.  Sup. S-32.

(d)   In  Annex  I  of  the  prospectus  supplement,  FHASI, Credit  Suisse,  BAS,  and  FTN  presented  a  table  entitled "Original  Loan-to-Value  Ratios  for  the  Mortgage  Loans  in Pool  I."  This  table  divided  the  loans  in  Pool  I  into  11 categories  of  original  LTV  (for  example,  loans  with  an original  loan-to-value  ratio  range  of  50.00%  and  below, 50.01%  to  55.00%,  55.01%  to  60.00%,  etc.).  This  table contained  untrue  or  misleading  statements  about  the  number of  mortgage  loans,  the  aggregate  principal  balance outstanding,  and  the  percentage  of  the  mortgage  pool  in each of these categories. FHAMS 2007-FA4 Pros. Sup. I-1.

(e)   "The  weighted  average  original  loan-to-value  ratio of  the  mortgage  loans  in  Pool  I  is  expected  to  be approximately 72.59%." FHAMS 2007-FA4 Pros. Sup. I-1.

**Item 56.  Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (Pool I) | 1,557 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 483 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $34,177,431 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 90 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,709,439 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 128 |
| Weighted-average LTV for loans, as stated by defendants | 72.59% |
| Weighted-average LTV for loans, as determined by the model | 88.6% |

**Item 62.  Undisclosed additional liens in Pool I:**

**(a)  Minimum number of properties with additional liens:** 514

**(b)  Weighted average CLTV with additional liens:** 80.0%

**Item 71.  Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, FHASI, Credit Suisse, BAS, and FTN made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by FHHLC: "All appraisals are

required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Qualifications Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and/or Freddie Mac." FHAMS 2007-FA4 Pros. Sup. S-35.

**Item 77. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, FHASI, Credit Suisse, BAS, and FTN made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In Annex I of the prospectus supplement, FHASI, Credit Suisse, BAS, and FTN presented a table entitled "Occupancy Types for the Mortgage Loans in Pool I." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Investor Property," and "Secondary Residence." This table contained untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percentage of the mortgage pool in each of these categories. FHAMS 2007-FA4 Pros. Sup. I-2.

(b) In the "Occupancy Types for the Mortgage Loans in Pool I" table in Annex I, FHASI, Credit Suisse, BAS, and FTN stated that of the 1,557 mortgage loans in Pool I, 906

were secured by primary residences and 651 were not. FHAMS
2007-FA4 Pros. Sup. I-2.

**Item 84. Details of properties in Pool I that were stated
to be owner-occupied, but were not:**

    **(a) Number of loans for which the owner of the
property instructed tax authorities to send
property tax bills to him or her at a different
address:** 125

    **(b) Number of loans for which the owner of the
property could have, but did not, designate the
property as his or her homestead:** 136

    **(c) Number of loans for which the owner of the
property did not receive bills at the address of
the mortgaged property but did receive bills at a
different address:** 82

    **(d) Eliminating duplicates, number of loans about
which one or more of statements (a) through (c) is
true:** 272

**Item 87. Untrue or misleading statements about the
underwriting standards of the originators of the
mortgage loans:**

On pages S-33 through S-35 of the prospectus
supplement, FHASI, Credit Suisse, BAS, and FTN made
statements about the underwriting guidelines of FHHLC. All
of those statements are incorporated herein by reference.

One of these statements was that: "The First Horizon
Underwriting Guidelines are applied to evaluate the
prospective borrower's credit standing and repayment
ability and the value and adequacy of the mortgaged
property as collateral." FHAMS 2007-FA4 Pros. Sup. S-33.

**SCHEDULE 12 OF THE COMPLAINT**                    **Page 6**

Another one of these statements was that: "Exceptions to the First Horizon Underwriting Guidelines are permitted where compensating factors are present." FHAMS 2007-FA4 Pros. Sup. S-34.

**Item 94.  Early payment defaults in Pool I:**

(a) **Number of the mortgage loans that suffered EPDs:** 20

(b) **Percent of the mortgage loans that suffered EPDs:** 1.3%

**Item 95.  90+ days delinquencies in Pool I:**

(a) **Number of the mortgage loans that suffered 90+ days delinquencies:** 550

(b) **Percent of the mortgage loans that suffered 90+ days delinquencies:** 35.3%

**Item 96.  30+ days delinquencies in Pool I:**

(a) **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 502

(b) **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 32.2%

**Item 98.  Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-5, S-13 and S-84 through S-86 of the prospectus supplement, FHASI, Credit Suisse, BAS, and FTN made statements about the ratings assigned to the certificates issued in this securitization. FHASI, Credit Suisse, BAS, and FTN stated that Colonial's certificate was rated Aaa by Moody's, AAA by Standard & Poor's, and AAA by

**SCHEDULE 12 OF THE COMPLAINT**                      **Page 7**

Fitch.  FHAMS 2007-FA4 Pros. Sup. S-5.  These were the highest ratings available from these rating agencies.

FHASI, Credit Suisse, BAS, and FTN also stated: "The issuance of the offered certificates is conditioned on the certificates receiving the ratings from Fitch, S&P, and Moody's indicated under the heading 'Expected Ratings' in the chart shown on page S-5 of this prospectus supplement." FHAMS 2007-FA4 Pros. Sup. S-13, S-85.

**Item 101. Summary of loans in Pool I about which the defendants made untrue or misleading statements:**

    **(a)** **Number of loans whose LTVs were materially understated as shown by the AVM:** 483

    **(b)** **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 514

    **(c)** **Number of loans for which the properties were stated to be owner-occupied but were not:** 272

    **(d)** **Number of loans that suffered EPDs:** 20

    **(e)** **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 938

    **(f)** **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 60.2%